**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION**

Evelyn Kauffman and Dennis Rocheleau,    )
                                       )
        Plaintiffs,               )
                                       )     Case No. 14-cv-1358
                v.           )
                                       )     The Honorable Lynn Adelman
General Electric Co.,           )
                                       )
        Defendant.         )

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT**

### Introduction

In summary plan descriptions re-issued and re-printed for decades, GE promised its salaried retirees that it intended to continue their benefits as described in those documents indefinitely. To be sure GE said in the SPD that it reserved a right to terminate or amend the GE Medicare Plans, and might do so specifically because of changes in federal or state law, ERISA, IRS regulations "or any other reason." But GE cancelled the Plans without any such objective necessity, and thereby violated both 29 U.S.C. § 1104(a)(1) and 29 U.S.C. § 1022 of ERISA. The specific assurances contained in Section 5.4 of the SPD were false. Re-issuing those very same assurances in Section 5.4 in July 2012, just six weeks before terminating the coverage of plaintiff Kauffman and others and decimating the benefits, GE showed how contemptuously indifferent it was to whatever the SPD told the participants. Two years later, GE eliminated coverage under the Plans for salaried retirees altogether. Throughout this case, GE has argued that the promises in Section 5.4 of the SPD were illusory—in effect, deceptive.

Plaintiffs are well aware that these are not vested benefits, but the promises do place limits on GE's right to amend or terminate. Under *CIGNA Corp. v. Amara,* 131 S. Ct. 1886

Case 2:14-cv-01358-LA   Filed 06/06/16   Page 1 of 26   Document 80

(2011), and *Kenseth v. Dean Health Plan, Inc.* 722 F.3d 869 (7th Cir. 2013), which treat far less serious breaches of fiduciary duty than here, plaintiffs are entitled to a monetary remedy in the form of a surcharge. Only an appropriate surcharge can repair some of the damage done and repay participants for the security they have lost.

### Statement of Facts

Prior to January 1, 2015, GE provided Medicare supplemental health insurance to its retirees that were over age 65 through various GE Medicare Health Insurance Plans (hereinafter the "Plans"). ¶ 1.[1] As of the filing of this lawsuit, the retired salaried employees and spouses receiving benefits under these Plans consisted of about 65,000 people. ¶ 1. Pursuant to its duty as "plan administrator" under Section 102 of ERISA, 29 U.S.C. § 1022, GE issued a Summary Plan Description or SPD describing the Plans to these beneficiaries at least every five years. Beginning at least in the early 1990s, GE included in this SPD, which it called the "Handbook," a section addressing whether the Plans could be terminated, and the circumstances under which they would be terminated. ¶ 3. When GE last issued the Handbook to salaried retirees in July 2012 this language was in Section 5.4. ¶ 4. As of July 2012, Section 5.4, which still contained substantially the same language that it had for decades, stated as follows in relevant part:

> 5.4 CAN THE PLANS BE CHANGED, REPLACED OR TERMINATED?
>
> GE expects and intends to continue the GE Medicare Benefit Plans described in this handbook indefinitely, but reserves the right to terminate, amend or replace the programs or plans, in whole or in part (subject to applicable contractual requirements), at any time and for any reason, by action of the Board of Directors.
>
> A decision to terminate, amend or replace a plan may be due to changes in federal law or state laws governing qualified retirement

---

[1] All paragraph citations, unless otherwise noted, are to Plaintiffs' Local Rule 56 Statement of Facts, which is being filed contemporaneously.

2

or welfare benefits, the requirements of the Internal Revenue Service, ERISA or any other reason.

¶ ¶ 3-4. While GE included a reservation of rights in the Plans themselves, it did not include the assurances from Section 5.4.

This case concerns GE's decision to cancel the Plans for all eligible salaried retirees and spouses effective January 1, 2015 for no other reason than to cut costs. In the years immediately preceding this decision, the costs of maintaining these benefits had actually decreased. ¶¶ 21-24. But in 2007 a change in GE's collective bargaining agreements and accounting practices meant that for the first time GE had to report the total costs of providing these benefits into the future as a liability rather than just reporting the costs of the next few years. ¶ 16. This resulted in a $4.8 billion increase in GE's reported liabilities for retiree health plans. ¶ 16. Around the same time, GE's CEO Jeffrey Immelt and its Senior Vice President of Human Resources, John Lynch, began stating publicly their belief that the cost of the benefits was not sustainable. ¶ 13. And in 2006, GE hired the firm of Towers Perrin, later known as Towers Watson, to consult with GE on changes to it retiree health benefits. ¶ 17. Towers Watson also operated "exchanges" where beneficiaries can shop for insurance, including "OneExchange," which is the exchange provided to GE retirees now that the Plans have been terminated. ¶ 21.

Sometime prior to 2012, GE began considering the possibility of terminating Plan coverage of all salaried retirees. Towers Watson began its analysis of this plan for GE prior to 2012. ¶ 18. On February 9, 2012, John Lynch presented the changes under consideration to the Management Development & Compensation Committee (MDCC) of GE's Board of Directors. ¶ 23. The next day, GE management advised the entire Board of the changes under consideration. ¶ 24. Management continued reporting to the MDCC on these plan "design" changes over the

3

next few months. ¶¶ 25-27. By June, management gave the MDCC a detailed plan, including a timeline for informing beneficiaries of the changes in the fall of 2012. ¶ 27.

Shortly thereafter, in July 2012, GE re-issued its SPD or Handbook to salaried retirees. ¶ 4. It once again included Section 5.4, saying GE "expects and intends to continue the benefits described in [the] Handbook indefinitely." ¶ 4. But, as GE already had a schedule for "roll out" of changes to terminate coverage of some participants and make major changes in co-payments of others, this statement in Section 5.4 was false. Just weeks later, on September 7, 2012, in accordance with the actions described to the Board on February 10, 2012, GE's Board of Directors voted to terminate benefits for anyone who did not reach the age of 65 by January 1, 2015. ¶ 8. Many more, including Plaintiff Rocheleau, would have to pay substantially higher premiums on that date. ¶ 9.

In 2013, GE continued to proceed toward the complete termination of GE's defined benefit plans and replacement with defined contribution plans, in accordance with the changes described as under consideration to the full Board in February 10, 2012. ¶¶ 41-45. At CEO Jeffrey Immelt's urging, John Lynch's successor, Susan Peters, asked her subordinates to conduct a review of other large corporations that might have shifted to defined contribution plans. ¶¶ 42-44. With the help of Towers Watson, GE found that approximately a third of the Dow Jones 30 had defined contribution plans, approximately a third continued to have defined benefit plans like GE's, and a third had no benefits at all. ¶ 47. On September 5, 2014 the GE Board of Directors resolved that the termination of coverage on January 1, 2015 would actually apply to *all* salaried retirees and their spouses. ¶¶ 51-54. While in 2014, when GE last provided the Plaintiff class coverage under the Plans, the Plans cost about $1,600 annually per participant to maintain, GE would now provide each retiree that was already 65 on January 1, 2015 a $1,000

"Retiree Reimbursement Account" or "RRA" to spend on health insurance purchased through One Exchange in 2015. ¶¶ 7, 53. Retirees like Kauffman who would not turn 65 until after January 1, 2015 would receive no such subsidy. ¶ 53. This time GE's SPD for the RRA plans did not contain any "expects and intends" language regarding the RRAs, as it had when describing the Plans. ¶ 55. It made clear that the RRAs were not guaranteed and may or may not be renewed in the years to come. ¶ 55.

John Lynch, the Senior Vice President of Human Resources, who presented the proposed changes to the Board in September 2012, testified in a deposition that he had never read or had any knowledge until just prior to his deposition that Section 5.4 even existed. ¶ 32. There is no mention of Section 5.4 in any of the material presented to the Board. ¶ 33. Virginia Proestakes, the director of medical benefits, testified in her deposition that she never discussed Section 5.4 with any other GE executive during this period. ¶ 35. GE did not obtain any legal opinion about the representations made in the SPD and whether they placed any obligation on GE to continue the Plans. ¶ 38.

Through the course of this case, GE has denied that the assurances in Section 5.4 mean anything at all. Whatever the "expects and intends" language might imply, GE maintains that the reservation of rights clause renders it entirely meaningless. GE says the same about its list of specific reasons as to why it might terminate coverage—the list is meaningless, because it ends with the catchall phrase "or any other reason." Finally, GE says that even if the Section *did* mean something, it cannot be enforced against GE, because it exists only in the SPD, not the Plans. In other words, GE admits that its SPD was not an accurate description of the Plans and that it never truly intended Section 5.4 to be an accurate representation of its intentions because it was entirely meaningless.

For the reasons set forth below, these admissions by GE and its executives represent undisputed facts that prove Plaintiffs' claim that GE breached its fiduciary duties to the class.

Argument

**I.    GE breached its fiduciary duties to the plaintiffs and class members by placing false and misleading representations in the Summary Plan Description.**

GE included two promises in the SPD or Handbook to mislead Plan participants as to the security of their benefits - and when or under what circumstances GE might terminate the Plans. First, GE falsely represented its intent to continue the benefits as described in the Handbook indefinitely. Second, GE falsely represented that it might use its power to terminate in the event of certain types of *force majeure* or similar circumstances outside of its control. As explained below, these statements are not only belied by GE's own actions, but by its arguments before this Court regarding the meaning of the statements. In other words, not only did GE intend to cancel benefits without any necessity or compelling reason even as it was making these promises, but by coming before this Court and declaring that these statements are essentially meaningless, GE is essentially admitting that it deceived the plaintiffs and class members when it made these representations to them. It is even more deceptive to include them in the SPD, which is supposed to be just a summary of the Plans, since GE also intentionally misled participants about what was actually in the Plans. In so doing, GE violated its fiduciary duties to those participants.

**A.    GE falsely represented an intent to continue the benefits indefinitely.**

GE committed multiple deceptions in violation of its fiduciary duty of loyalty, which is also a duty of honest dealing. First, as alleged in the complaint, GE falsely stated in Section 5.4 of the Handbook, re-issued in July 2012, that it "expect[ed] and intend[ed] to continue the benefits described in the Handbook indefinitely." A few weeks later, on September 7, 2012, GE announced that it would raise the co-pays to 50 percent of plan costs, thus effectively cutting the

6

benefits "described in the Handbook" for retirees like Rocheleau. GE also closed off eligibility to retirees like Evelyn Kaufmann who had not yet reached age 65. But long before GE reissued the Handbook, GE had been planning to terminate the coverage not just of participants like Kauffman but to get rid of the Plans generally.

On February 10, 2012, the full Board heard a full-dress presentation from GE management that GE was considering the termination of coverage for participants like Kauffman who were retired but not 65—and doing so for over 65 participants but giving them a subsidy to buy coverage. ¶ 24. In his deposition, John Lynch—GE's Vice President for Human Resources who made the presentation to the Board recommending the changes adopted on September 7, 2012—said that GE had been planning these changes for a year. ¶ 12. Nonetheless, GE claims that it had no such consideration of such changes prior to January 2012 and withheld discovery as to this earlier period.

But long before January 2012 or even January 2011, there are recorded statements of GE officials indicating a major restructuring was in the works. Plaintiffs have set out published remarks of Jeffrey Immelt and John Lynch to that effect. ¶ 13. At any rate, for a presentation to take place at the Board level in the first week of February 2012, in a company as large as GE, senior management must have already made the decision to terminate coverage of Kauffman and others and to slash benefits by half for Rocheleau and others. Long before July 2012, notwithstanding the re-issued language in Section 5.4, GE did *not* intend to continue the benefits as described in the Handbook, "indefinitely" or at all.

GE has a duty not to mislead participants. Section 404(a)(1) of ERISA, 29 U.S.C. 1104(a)(1) requires that "a fiduciary shall discharge his duties with respect to a plan solely in the in the interests of the participants." ERISA imposes both a duty of loyalty in 29 U.S.C. §

1104(a)(1) and a duty of care in 29 U.S.C. 1104(a)(2). That duty is a very broad one in this Circuit. "Fiduciaries must not only refrain from misleading plan participants…, but they 'must also communicate material facts affecting the interests of beneficiaries.'" *Kenseth v. Dean Health Plan*, 610 F.3d 452, 468 (7th Cir. 2010) (hereinafter "*Kenseth I*") (quoting *Anweiler v. American Elec. Power Serv. Corp.*, 3 F.3d 986, 991 (7th Cir. 1993)). "Fiduciaries may be held liable for statements pertaining to future benefits if the fiduciary knows those statements are false or lack a reasonable basis in fact." *Flanigan v. Gen. Elec. Co.*, 242 F.3d 78, 84 (2nd Cir. 2001). As the Seventh Circuit noted in *Frahm v. Equitable Life Assur. Soc'y. of U.S.*, 137 F.3d 955, 961 (7th Cir. 1998), representations about present intentions are false statements of fact "if, at the time the statements were made, the speaker actually had a different intention." Section 5.4 is not a prediction but a factual statement of what GE "intends" to do. Any such honest intent—assuming it ever existed—had changed long ago, at least by the Board meeting of February 2012. Indeed, GE could not have had such intent in 2012, or earlier—in part because GE decisionmakers had no idea that Section 5.4 even existed. ¶¶ 33-36.

When 29 U.S.C § 1022 is considered, the statement is even more deceptive. That section requires that in any summary plan description (SPD), GE must use language "calculated to be understood by the average participant." 29 U.S.C. § 1022(a). That is especially true about "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits." *Id.* at § 1022(b). GE's only defense to intentional deception is to argue—as GE might now do here—that GE really means the members of the Board, and none of them read or knew of Section 5.4. After all, Senior Vice President Lynch himself who made the presentation to the Board did not know of Section 5.4, and Proestakes testified that she could not recall anyone mentioning or discussing Section 5.4 in the year prior to September 2012. ¶ 33-36. In other

8

words, the GE Board and top management like Lynch made this decision with no knowledge of what GE had been saying to participants in Section 5.4. Whether a breach of the duty of loyalty or of care, or of prudence, or of skill—the fact that no one in authority either knew or took account of Section 5.4 is the most extraordinary fiduciary breach of all. Indeed, there is no precedent in the case law where an employer acting as plan administrator did not know of or bother to read what it was saying in the SPD at all. But the Seventh Circuit has made clear that an ERISA trustee can be held liable even for merely *negligent* misrepresentations if they result from the trustee's failure to ensure that participants receive accurate information. *See Kenseth I*, 610 F.3d at 469-72. The decision-makers at GE—those responsible for the loss of benefits challenged here—have essentially admitted that they failed in this regard. They were entirely unaware of the representations being made in Section 5.4 and did nothing to ensure that those responsible for writing the SPD were accurately stating GE's intentions.

**B.  GE falsely represented or at least misled participants, including plaintiffs, about the reasons it might change or cancel benefits.**

GE also breached its fiduciary duty as plan administrator by saying that GE might use its power to terminate the Plan for "changes in federal or state laws...the requirements of the Internal Revenue Service, ERISA, or any other reason." Despite the catch-all phrase at the end, this statement too is false, or at the very least misleading. GE has taken the position in this suit that the language quoted here gives GE an absolute right to terminate for "any...reason." Of course the average participant would focus on the specific reasons—changes in law, beyond GE's control. *See* 29 U.S.C. § 1022(a) (SPD language "shall be written in a manner calculated to be understood by the average plan participant, and shall be sufficiently accurate and *comprehensive* to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan") (emphasis added). Only a lawyer might notice otherwise. Yet a

9

competent lawyer would not interpret "any other reason" as GE now does. The irony is that while GE did intend to mislead, the particular language quoted above does limit GE. Under the principle of *ejusdem generis,* "any other reason"—a general reason that follows specific ones— must be a reason "like" those that come before. GE's lawyers may have crafted Section 5.4 as an empty or illusory promise that was nowhere to be found in the Plans—but the "ordinary contractual principles" that govern interpretations under ERISA, *see M&G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926 (2015), give these statements an objective legal meaning.

The plaintiffs' own understanding of the language is telling both because they were the intended audience for these statements—plan participants—and because of the unique roles of these two had as GE employees. Plaintiff Rocheleau—the chief labor negotiator for GE—read Section 5.4 as limiting GE's use of its undoubted right to terminate only to "life threatening" situations. ¶ 5. As he testified in his deposition, he took the phrase "any other reason" to mean that the company had a reasonable ambit in which to operate and to respond to some eventuality that could be, for lack of a better phrase, life threatening, unforeseen, or devastating. ¶ 5. Kauffman worked with the language of Section 5.4 every day in counseling GE employees who were about to retire. As to the specific reasons given when GE might terminate, she said, "And I knew that those conditions about state or federal legislation changing benefits had not occurred, and so it was my expectation that unless and until that happened, our benefits would continue for the rest of my life." ¶ 6.

The law has its own interpretation of "any other reason"—and it matches with the interpretation given by the plaintiffs and surely any other average plan participant. Under the principle of *ejusdem generis* or "of the same kind," GE is limited in just the way that Kauffman and Rocheleau and many others thought. Under that principle, a general term "any other reason"

10

is to be limited to the kind of specific reasons that preceded it. *See Circuit City Stores v. Adams*, 532 U.S. 105, 114-16 (2001); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 199 (2012); 5-24 *Corbin on Contracts* § 24.28 (2015); *see also id.* (explaining that related maxim of *noscitur a sociis* holds that "the meaning of unclear words may be gleaned by reference to other words associated with it" and "is wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to contract provisions") (internal quotations and citations omitted). As the Seventh Circuit has stated: "The canon of construction *ejusdem generis* teaches that [a] general reservation of rights [clause]...should be limited to 'items of the same type or nature as those specifically enumerated.'" *FCC v. Airadigm Communications, Inc.*, 616 F.3d 642, 656 (7th Cir. 2010) (quoting *United States v. Sec Magmt. Co.* 96 F.3d 260, 265 (7th Cir. 1996)).

To be sure, a court should apply the rule of *ejusdem generis* when it is consistent with other such rules of construction. 5-24 *Corbin on Contracts* § 24.28 (2015). Here of course it is consistent with the rule of *contra preferentem*, that an ambiguous text should be construed against the drafter. As this court has noted, it is also consistent with the principle that a court should endeavor to interpret the Handbook in a way that gives all of the terms meaning and reconciles all provisions. Decision and Order of 12/30/14 (Doc. # 35) at 5-6. Furthermore, it is consistent with the statutory command of Congress that language in 29 U.S.C. § 1022 that language like this in Section 5.4 should be "calculated to be understood by the average participant," and necessarily interpreted in the same manner.

By the termination of coverage here, GE breached this promise in the second paragraph of Section 5.4—as well as the promise in the first, i.e., that GE "intends to continue the benefits as described in the Handbook indefinitely." It did not face any objective necessity, or

"catastrophic" situation. It faced no new or added cost. It was not in any distress. And indeed GE now effectively admits that it never had any intent to live up to these promises. It asserts that they are meaningless because it always reserved the absolute right to terminate even if it had no objective necessity or in fact any reason at all..

### C.      Both of the promises in Section 5.4 of the SPD were especially misleading because they falsely represented the terms of the Plan itself.

GE finally engaged in deception by putting in these assurances and qualification in the SPD when GE knew that it had no such obligation in the Plans themselves. As set out in 29 U.S.C. § 1022, the SPD is supposed to be a recitation of what is in the plan, and only what is in the plan. In particular the SPD has to be accurate as to the ways in which the participants can lose coverage. *See* 29 U.S.C. § 1022(b). Section 5.4 is in fact a statement about when plaintiffs can lose coverage—and to the extent those statements were not in the Plans, the SPD is false. The fiduciary wrong here is much greater than in *Kenseth*, which did not involve these systematic, long-term deceptions as to what was in the Plans. Nor is this a case of a negligent discrepancy, as in *Kenseth*. Long before *CIGNA Corp. v. Amara,* some GE lawyer may not have worried to put in such a deception in an "unenforceable" SPD. In other words, the Handbook did exactly what by law it is not allowed to do—mislead participants with these gratuitous and false statements as to the contents of the Plans.

## II.      By engaging in these multiple forms of deception, GE inflicted injury on the participants.

By placing these false and deceptive statements in the SPD, GE caused substantial harm to the plaintiffs and the class members. As this Court noted in its June 5, 2015 order, Plaintiffs alleged that they lost their health benefits. Decision & Order of 6/5/15 (Doc. # 49) at 5. At this stage of the proceedings, that is no longer just an allegation—it is an undisputed fact. No doubt many participants never even read Section 5.4. But under *CIGNA Corp. v. Amara*, they need not

12

have done so. 131 S. Ct. 1866, 1881 (2011). The *Amara* Court held that in order to prove a violation under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), plaintiffs must show that they suffered actual harm and clarified that this harm "might…come from the loss of a right protected by ERISA or its trust-law antecedents." *Id.* Plaintiffs lost a right that they had under ERISA—the right to the loyalty, or honest services of a fiduciary, to which they are entitled under 29 U.S.C. § 1104(a)(1). They also suffered a loss of their right to an accurate, non-deceptive SPD, especially as to the security of their benefits. *See id.* (recognizing harm caused by failure to provide proper summary information); *see also* Decision & Order of 6/5/15 (Doc. # 49) at 5 (same).

The injury here is far more serious than in *Kenseth v. Dean Health Plan, Inc.*, 722 F.3d 869 (7th Cir. 2013) (hereinafter "*Kenseth II*"), where an employee of Dean Health orally misstated whether a participant was covered for bariatric surgery. Unlike *Kenseth*, GE was engaged in a deception far bigger and more systematic—issuing and re-issuing the same false SPD over the course of the working and retirement lives of tens of thousands of retirees. Intended as a reassurance, GE meant it to be illusory. Furthermore, the promises in Section 5.4 were again mailed out *en masse*—to 65,000 salaried participants—just six weeks before GE terminated the coverage of participants like Kauffman altogether and effectively reducing by up to half the "benefits as described in the Handbook" for others like Rocheleau. As noted above, Board members and top GE officers did not even know Section 5.4 existed—and Lynch later said it did not matter if he had known about it. So reassurances kept flying out of GE headquarters without anyone knowing or caring what was being said. As set forth below, the Supreme Court and the Seventh Circuit have explained that when participants are the victims of lies, misrepresentations, or just a willful disregard of what was being said at all, and then deprived of the benefits they are promised—when the Plan does not match up with the

representations made by the trustee—they are entitled to make-whole equitable remedies such as reformation and surcharge.

But the harm in this case went further. Plaintiffs lost more than the right to an honest fiduciary service—they lost earnings they might otherwise have had without such deception. Professor Gerald Friedman, plaintiffs' expert, makes that very point: "Labor economists have demonstrated that workers prepay for their benefits with lower earnings." ¶ 62. In a footnote he expands on this point, compiling citations for the proposition that "[i]t is widely accept by labor economists that, in the long run, benefits are paid out of wages." ¶ 62 Had GE had not held out this form of deferred compensation, and emphasized its long term security, plaintiffs would have likely had higher earnings during their work lives instead. Indeed, by GE's own argument about the need to be "competitive," GE would have had to pay more to be "competitive" with its peers in attracting the now retired participants to work at GE. By continuing deceptive statements in the Handbook at least from the early 1990s if not before—statements that were intended to lull participants that the benefits were there—GE ended up paying less, and plaintiffs ended up earning less, during their working lives. Prior to the changes in benefits—in 2014—GE was paying approximately $1,600 a year per participant. ¶ 7. There was also the security of coverage in the case of serious illness, the real benefit of such insurance. Now GE is paying just $1,000, maximum, for those qualifying for its Retiree Reimbursement Account, with no such guarantee of protection. That gives the measure of how GE's deception has enriched GE.

Plaintiffs recognize that this is a motion for summary judgment, based on uncontested facts. But it should be said here that evidence would show in a trial of fact that Section 5.4 had been designed by GE to ensure that more salaried employees like participants did not seek the contractual benefit guarantees that union membership could offer. Even GE acknowledges that

14

its rights in Section 5.4 are "subject to applicable contractual requirements." If non-union participants had understood that GE was trying to deceive, they might have obtained some contractual commitment similar to that of union hourly employees. GE did not issue Section 5.4 because it had a soft heart—Section 5.4 had a function, i.e., heading off the kind of unionization of at least some salaried participants who might have otherwise sought the protection of collective bargaining agreements. Without the false assurance of Section 5.4, GE's unions might have succeeded in organizing more of the plaintiff class, and such increased union strength would have led to a different and better bargain for all of the participants.

III.     **Participants are entitled to an equitable remedy for the harm they have suffered, including reformation of the plans, enforcement of these plans as reformed, and a surcharge.**

GE, like other employers, could have had a simple reservation of rights clause. Indeed, as GE points out, before the participant reaches Section 5.4, the Handbook already has reservation of rights clause. The purpose of Section 5.4 was to mislead the participant—to deceive the participant as to whether and when these reserved rights would be used. It is rather obvious that, just like the employer in *Varity v. Howe,* 516 U.S. 489 (1996), GE was trying to induce employees to act in a certain way—at the very least to induce their employment at GE and not somewhere else, and certainly to accept a lower level of earnings during their working lives in return for more security after they retired. But, regardless of what GE hoped to achieve by this deception—what benefits it sought to obtain—Section 5.4 does impose limits on GE, and should be given effect. The Court is obliged to give all terms of the SPD their plain meaning, not to render inconvenient terms meaningless as GE would propose. And the Supreme Court has held that under Section 502 of ERISA, 29 U.S.C. § 1132(a)(3), a court may order reformation of a plan to be consistent with a statement in the SPD that is false as a result of fraud or mistake. *Amara*, 131 S. Ct. at 1879-1880; *see also Kenseth II*, 722 F.3d at 878.

15

To reform the Plans, i.e., to include Section 5.4 in them, one need not show each participant "detrimentally relied" on its false assurances. *Amara*, 131 S. Ct. at 1881; *Kenseth II*, 722 F.3d at 879. An equity court could reform a contract "where a fraudulent misrepresentation or omission materially affected the substance of the contract." *Id.* Plaintiffs have shown how the false assurance in Section 5.4 did cause a direct injury—and how GE benefitted at the expense of participants. In fact, GE profited not just from having a loyal and largely non-union salaried workforce for decades, but GE has also bragged to its shareholders in its Annual Reports about the billion dollars it saved when it terminated benefits that would have remained in place had Section 5.4 been in the Plan. ¶ 60. That being so, plaintiffs have a right to an equitable remedy crafted to fit the harm they suffered, including reformation of the Plans—or a surcharge to GE as fiduciary. As the Seventh Circuit explained in *Kenseth II*, citing to *Gearlds v. Entergy Services, Inc.*, 709 F.3d 448 (5th Cir. 2013), and *McCravy v. Metropolitan Life Ins. Co.*, 690 F.3d 176 (4th Cir. 2012), ERISA beneficiaries are entitled to "make-whole money damages" in the form of a surcharge when the trustee breaches its fiduciary duty by promising benefits to which the beneficiaries are not actually entitled under the Plan as GE as done here. 722 F.3d at 880-83. This is especially so when the trustee profited from the breach, because such a remedy is necessary in order to avoid "perverse incentives." *See id.* at 881-82 and n.4 (citing *McCravy*). As this Court stated early in this case:

> Employers should not be encouraged to promise attractive benefits to employees and create the impression that such benefits will continue as long as certain circumstances do not occur and then eliminate the benefits even though such circumstances do not occur.

Decision and Order of 12/30/14 (Doc. #35) at 5.

Plaintiffs are therefore entitled to a reformation of the Plans to include both of the promises GE made in Section 5.4. Both of these promises—first, to continue the benefits *as*

*described in the Handbook* "indefinitely" and second, to terminate only for an objective

necessity or a similar extraordinary reason—are two separate obligations that GE has breached.

## IV. GE breached the promise that it intended "to continue the benefits as described in the handbook indefinitely."

While Section 5.4 contains a standard reservation of rights clause, it also contains

language concerning how and when GE will use that right. First, GE states that it "expects and

intends to continue the benefits *as described in the Handbook* indefinitely." ¶ 4 (emphasis

supplied). Second, GE states that "a decision to terminate may be due to changes in federal law

or state laws governing qualified retirement or welfare benefits, the requirements of the Internal

Revenue Service, ERISA or any other reason." Plaintiffs submit that like any ERISA plan

language, these statements in Section 5.4., once incorporated in the plan, should be interpreted

under ordinary contractual principles. *See Tackett*, 135 S. Ct. 926. As stated both by the Seventh

Circuit and by this Court in this very case, that means a court should try to give effect to all parts

of the contract, including all parts of Section 5.4; not just the reservation of rights clause but the

language qualifying how it will be used. The contractual principles invoked by the Supreme

Court in *Tackett* apply here as well: specifically, that no promise here should be interpreted to be

"illusory." *Id.* As pointed out in early briefing, there is an easy way to give effect to all parts of

Section 5.4.

First, the opening language of Section 5.4—the first thing the participant reads, that GE

"expects and intends" to continue "indefinitely" the particular benefits "as described in the

Handbook"—is the same as or analogous to a "best efforts" clause. As distinct from a covenant

to act in good faith, a best efforts clause imposes a duty of *diligence*. See *Farnsworth,* On Trying

to Keep One's Promises: The Duty of Best Efforts in Contracts Law 46 U. Pitt. Law Rev 1

(1986); *see also Farnsworth on Contracts*, § 7.17c (2ed. 2001); 2-6 *Corbin on Contracts* § 6.5

17

("'Best efforts' is a more rigorous standard than 'good faith'"). Such clauses are enforceable if there is a goal or guideline or practical standard by which they can be measured. *See Olympia Hotels Corp. v. Johnson Wax Dev. Corp.,* 908 F.2d 1363, 1373 (7th Cir. 1990); *Bloor v. Falstaff,* 601 F.2d 609 (2nd Cir. 1979) (Friendly, J.); *Hoffman v. L&M Arts,* 774 F. Supp. 2d 826, 833 (N.D. Tex. 2011); 2-6 *Corbin on Contracts* § 6.5 (2015);. Even when a contract is silent, a "best efforts" clause is often implied. *Id.* (citing *Wood v. Lucy, Lady Duff-Gordon*, 118 N.E. 214 (N.Y. 1917)). Here of course the "best efforts" clause is not implied but explicit. Even where the term "best efforts" is not literally used, courts take "idiosyncratic language" to the same effect and consider it a "best efforts" clause. *See, e.g., Hoffman*, 774 F. Supp. 2d at 833 (compiling cases). Indeed, Section 5.4, if anything, requires more than a "best effort." Rather than GE limiting itself to do its best, GE says it intends to continue the benefits—not just "if it can," or "for a reasonable period," but "indefinitely." Yet plaintiffs do not seek to enforce anything so sweeping. Section 5.4, in plaintiffs' view, holds GE only to a "reasonable" effort—one that can be ascertained by the kind of effort GE has been making in the past. Here the "goal" or "guideline" or "practical standard" to be met is much easier to ascertain than in cases like *Olympia, supra* (leaving to a jury to determine the effort that a hotel chain should have made to establish a successful new hotel). GE's records show the effort it was making. To continue the Plans in 2014, GE was spending approximately $1,600 per participant per year. It was making less effort than before, since the cost of maintaining the Plan had dropped. On February 9, 2012, management told the MDCC the pre-tax costs of retiree health and life had been steadily dropping: $1.4 billion in 2009, $1.4 billion in 2010, $1.3 billion in 2011, and an estimated $1.2 billion in 2012. ¶ 15. GE was required to make less of a financial effort every year.

18

There can be no serious dispute that GE has breached this obligation to make its best efforts to continue the benefits. GE is now spending no more than $1,000 per participant in a Retirement Reimbursement Account (RRA)—in a defined contribution plan, instead of a defined benefit plan, where GE assumes much of the risk. This RRA is not guaranteed—GE maintains that it can be cancelled at any time without cause. And it is not even providing the RRA to class members like Plaintiff Kauffman that turned 65 after January 1, 2015.

Of course GE denies that it meant anything at all when saying it "intends to continue the benefits indefinitely." Earlier in this case, as if she were an expert on Section 5.4, GE submitted the affidavit of Virginia Proestakes, who is the head of medical benefits at GE. If anyone should know the meaning of Section 5.4, it should be Proestakes and she was the affiant who gave GE's version of Section 5.4 to this Court. *See* Decl. of Proestakes (Doc. # 31). In her deposition, however, she admitted to being baffled as to why in Section 5.4 GE says that it "expects and intends to continue the benefits described in the Handbook indefinitely." ¶ 36. Indeed, she did not even know what GE means in Section 5.4 when it says "GE." ¶ 36. Her statement is unsurprising since in a response to request to admit, GE also claimed not to know what the term "GE" means:

> [Admit that w]hen GE issued this handbook in July 2012 GE did not expect or intend to continue the benefits described in this handbook indefinitely.
>
> RESPONSE TO REQUEST…:
>
> GE objects to this Request on the grounds that it is vague and ambiguous as to the term and phrase "handbook" and "continue the benefits," which are undefined. GE additionally objects to this Request on the grounds that it is overbroad and vague based on its use of the term "GE," which is undefined; GE employs more than 300,000 individuals and, at all relevant times, the power and ability to modify the GE Medicare Plans rested exclusively with the GE Board of Directors. Subject to and without waiving the foregoing objections, DENIED.

¶ 37.

So GE denies that it did *not* intend to continue the benefits "indefinitely." Necessarily, then, to be truthful, GE says that it did in fact intend to continue these benefits indefinitely, just as it said in Section 5.4. It is a perilous position for GE to stake out. The last iteration of GE's "intent" to continue the benefits came six weeks before the GE Board—after getting regular and detailed briefings from GE management for months about the rollout of major changes in the Medicare plans—voted to terminate the coverage of plaintiff Kauffman and others and to make major changes to the benefits of other participants.

Plaintiffs also specifically asked GE in an interrogatory how Section 5.4 came into the Plans at all. GE claimed that after due inquiry it did not know why it was there at all. ¶ 39. This would be consistent with Lynch's testimony that he did not even know Section 5.4 *was* in there—and since Lynch himself did not know, no one on the Board could have known either. This astonishing denial of any knowledge of Section 5.4 is not a defense to GE's contractual breach. GE also breached its promise not to amend or terminate the benefits described in the handbook absent a change in law or similar objective necessity. The drafter of Section 5.4 may have believed GE had committed itself to nothing when it stated, in the second paragraph: "A decision to terminate...may be due to changes in federal or state laws governing qualified retirement or welfare benefits, the requirements of the Internal Revenue Service, ERISA, or any other reason." If so, the drafter, whether a lawyer or not, is wrong. As set forth above, the ordinary contract principles including *ejusdem generis*, *contra preferentum*, and the preference for reconciling all provisions require that "any other reason" be interpreted to include only reasons of a similar kind to those listed.

20

GE breached this promise. It does not—and cannot— argue that it ended the coverage of plaintiffs because of a change in federal law, an IRS regulation, or "any other reason" over which GE lacked similar control. Indeed, although on an admittedly preliminary evidentiary record, this Court has already noted as much:

> It is important to note that defendant did not terminate the Plans for reasons of the type listed in the handbook, all of which involve a *force majeure*, something outside of defendant's control such as a change in the law. Rather, defendant appears to have terminated the Plans to save money.

Decision and Order of 12/30/14 (Doc. #35) at 5-6. GE has still not presented any real reason, except that some other companies were doing it. Publicly GE has claimed it cut benefits to be "competitive." But GE does not mean this in the normal sense of "competitive," i.e., to be able to compete successfully in terms of price. It has nothing to do with GE sales or market share, for example. GE apparently means it is not necessary in terms of attracting the best employees—but that notion of being "competitive" makes no sense here because GE is not trying to "attract" the best retirees. "Benchmarking" may make sense for setting the salary of Immelt or Lynch. But, the participants have already *retired*. No one is trying to bid them away.

In any event, "benchmarking" does not explain why GE took this action. GE did look at 32 other companies, most of them in the Dow Jones 30. In 2014, Towers Watson found that 13 of the "peers" had defined benefit plans for retirees, 9 had defined contribution plans, and 10 had nothing in the way of retiree health insurance. ¶ 47. Of course it is impossible to make any conclusion as to relative labor costs—employees who did not have these benefits may have had other compensation that GE retirees did not. They may have had higher pensions. Even more telling, GE moved to a $1,000 RRA or subsidy, which is much lower than that offered by other "peers." As pointed out by Justin Dietz, a Towers Watson employee, the average RRA or subsidy among GE's "peers" was $1,558 per participant. ¶ 50. As shown by emails obtained in

21

discovery, GE terminated the coverage of all participants in 2014 in part because Immelt found out that IBM was moving to an exchange model. ¶ 49-52. GE was afraid it had not been hard enough on participants—or at least, Proestakes sent an email saying that compared to IBM's action, GE's action in 2012 now looked "lame." ¶ 44. Not wishing to look "lame," GE was going to do the same. But it can hardly be disputed that many of GE's "peers" were paying significantly more into their RRAs. ¶¶ 49-50. Towers Watson let GE know that before GE cut the subsidy to just $1,000 per participant, one of the lowest amounts in the survey. ¶¶ 49-50. It is simply not realistic that this had anything to do with being competitive—or that cutting a few billion dollars in future liabilities could ever be necessary for on of the largest corporations in the world, which consistently reaps net profits five times that size *per year*, to remain "competitive" with its "peers." None of this truly compelled GE to terminate the coverage of the plaintiffs, nor is it the kind of *force majeure* reason that fits the promise in Section 5.4.

## V.    As a remedy, GE should be obligated to pay a surcharge for its breach of fiduciary duty under 29 U.S.C. 1104(a)(1) and (2) and 29 U.S.C. 1022(b).

In violation of 29 U.S.C. 1104(a)(1) and 29 U.S.C. 1022(b), GE used the SPDs required by law to engage in serious fiduciary misconduct. For decades it kept reprinting and sending out assurances that it continues to insist were illusory. The losses to the 65,000 participants run in the billions, if they seek to replace the kind of coverage they had with GE. Lacking precise demographic data as to age, Plaintiffs' expert Professor Friedman could give only ranges of the net present value of the loss under a "static model" (where insurers do not increase premium as former participants age) and a "dynamic model" (where insurers do increase premiums as the former participants age). ¶¶ 63-64. Under a static model, the present value of the net loss, calculated at an interest rate of five percent—taking into account the RRA—ranges from $1.1 billion to $4.4 billion. ¶ 63. Under the dynamic model, the present value of the net loss—again

taking into account the RRA—will be higher, ranging from $1.7 billion to $5 billion. ¶ 64. Of course this assumes GE will keep its RRA in place. GE could cancel it next month—indeed, it may already be preparing to do so.

As Professor Friedman notes, the former participants are now exposed to much greater risk as they go on to the open market. "Instead of guaranteed access to GE insurance, retirees are force to buy insurance on the open market where they absorb the risks of higher costs and premiums." ¶ 65. GE's actuarial consultant, David Speier, who filed a Declaration in this case, claimed that with smart financial decisions, healthy retirees could acquire bare-bones Medicare Advantage plans with zero premiums on the premise that they would not have high drug costs and medical costs in the following year. Speier Decl. (Doc. # 21) at 9, ¶ 23. First of all, this was always an option for all of the class members. They did not have to use the coverage provided by GE if they wanted to go get a bare-bones plan with zero premiums on the open market. Second, all these healthy retirees in 2015 are going to get older and sicker, and they may regret signing up for a bare-bones plan. And as in Friedman's dynamic model, as they get older and sicker, insurers are going to charge more for better plans—if they can even gain entry to those plans. GE's participants—like all of us—buy insurance not to cover the most likely case next year, i.e., that the house will not burn down next year or we are not diagnosed with leukemia—but the less likely risk that such things may happen. Speier more or less says that only those who are going to be sick will really need to pay more. *Id.* at ¶¶ 12-13. But that is exactly why GE retirees who might be able to get away with a cheaper Medicare Advantage plan are willing to pay more to insure against the risk of unexpected bad health.

In that respect, throughout this case, GE and the plaintiffs have been talking past each other. The reason people buy insurance that they will never need is to prepare for the worst case

23

or just a worse case—even though David Speier or some other expert tells them not to worry and to play the odds. That is why the subjective need of participants to insure against risk has to be taken seriously—as Professor Friedman does and GE in this case refuses to do.

GE itself simultaneously claims no one is being hurt—except of course for 22 percent of the participants in just the first year—and says that it is saving over a billion dollars in long term plan obligations. ¶¶ 56, 60. No doubt in the "long term," a billion dollars is a large sum of money. And it is certainly a large sum of money to the class members, whose money will not go as far as GE's on the open market. But GE is a company that typically makes more than $15 billion in profit every year thanks in part to the past services of these participants. In decades of building up GE, these participants willingly took lower earnings in the past to be eligible for and get this kind of coverage in their old age. What GE has accomplished here is a wealth transfer of over a billion dollars from the retired participants to an immensely profitable company, as well as a risk transfer from GE back to the participants. This is why Professor Friedman estimates the harm to the class is greater than the benefit to GE. GE's claim that Rocheleau, Kauffman and other were not harmed when they lost their insurance is frivolous, if not disingenuous. And the fact that they may have had reasonably healthy years in 2015 does not make it any less so.

While there are at least three different equitable remedies that plaintiffs might seek for GE's fiduciary conduct, a surcharge or monetary penalty to make up for some of the financial loss seems to be the most appropriate. To be sure, plaintiffs—and the participant class—are entitled to reformation of the Plans to include Section 5.4, and an order to enforce the obligations it sets forth. However, plaintiffs are well aware of the administrative difficulties of putting the old GE Medicare Plans back in place—and the risk of confusion to participants.

24

What plaintiffs therefore seek instead is a surcharge that takes the form of an increase in the amount available for participants to draw upon in the RRA. Currently GE offers a credit of $1,000 per participant to pay for premiums on the open market and a fund for those with catastrophic medical expenses. GE can cancel this arrangement at any time. As a surcharge, plaintiffs seek an order requiring GE to increase this sum to the amount GE was spending per participant on the Plans in 2014, roughly $1,600, adjusted for inflation. Of course, they also seek a surcharge repaying them the same amount annually for the years already past when they were denied benefits, 2015 and 2016. This remedy will create new RRAs for some in the class, like Kauffman, and will simply supplement the $1,000 RRA GE is already providing others, like Rocheleau.

The sum of approximately $1,600 is an appropriate surcharge for various reasons. First, according to the email of Justin Dietz at Towers Watson, it roughly matches the "average" RRA or subsidy of companies that have gone to defined contribution plans. As noted by Mr. Dietz, only 15 percent of such companies have RRAs that are under $1,000. At least if the Medicare Plans are not to be reformed and reinstated, GE should be paying this much to all the participants. Second, and far more important, this surcharge requires GE to make the same financial effort that it was promising when it reissued the Handbook in July 2012.

Plaintiffs also seek an order to keep the surcharge into the RRAs in place for a reasonable period of time, to achieve a full and proper compensation. Although the length of time that is reasonable is likely dependent on a number of factors that may warrant further briefing, one possibility is to make it correspond to the closing of the so-called Medicare Part D "doughnut hole" in five years, since prescription coverage was the main benefit of the GE Plans.

This Court may wish to have additional briefing on an appropriate remedy. At this time plaintiffs respectfully move only that a class be certified and that GE be held liable to that class for breaches of 29 U.S.C. 1104(a)(1) and 29 U.S.C. 1022(a).

## CONCLUSION

For the reasons set forth above, plaintiffs request that this Court grant plaintiffs' motion for summary judgment.

Dated: June 6, 2016                                        Respectfully submitted,

                                                            s/ Sean Morales-Doyle
                                                            One of Plaintiffs' Attorneys

Thomas H. Geoghegan
Michael P. Persoon
Sean Morales-Doyle
Carol T. Nguyen
Despres, Schwartz & Geoghegan, Ltd.
77 West Washington Street, Suite 711
Chicago, Illinois 60602
(312) 372-2511