**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION**

Evelyn Kauffman and Dennis Rocheleau,　　　)
　　　　　　　　　　　　　　　　　　　　)
　　　　Plaintiffs,　　　　　　　　　　　)　　　Case No. 14-cv-1358
　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　v.　　　　　　　　)　　　The Honorable Lynn Adelman
　　　　　　　　　　　　　　　　　　　　)
General Electric Co.,　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　)
　　　　Defendant.　　　　　　　　　　　)

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

### Introduction

While GE *did* act with deceptive intent, the undisputed facts show that deceptive intent aside, GE still made false statements to participants—and violated contractual promises set out in Section 5.4 as to the security of their benefits. The undisputed facts show that GE decision-makers like Senior Vice President Lynch had a deliberate if not contemptuous indifference to anything that GE said to participants in Section 5.4. This breach of fiduciary duty—a duty of loyalty, but also a duty of care and honest fiduciary oversight—justifies the remedies approved in *CIGNA Corp. v. Amara*, 563 U.S. 421 (2011), and *Kenseth v. Dean Health Plan*, 610 F.3d 452 (7th Cir. 2010), and 722 F.3d 869 (7th Cir. 2013) (hereinafter "*Kenseth I*" and "*Kenseth II*", respectively). Plaintiffs are entitled to summary judgment in their favor, and denial of GE's own cross motion for summary judgment

### Argument

**I.　　　Both in July 2012 and for many years earlier, GE's reaffirmations of Section 5.4—with promises GE now claims to be illusory—were deceptive and in bad faith.**

In violation of 29 U.S.C. § 1104(a)(1) of ERISA, GE did deceive, lie, misrepresent, or act in bad faith when it told plaintiffs in Section 5.4 that GE "expects and intends to continue the

1

benefits described in this Handbook indefinitely." That is true as well about its statement that GE would terminate the Plans for changes in federal or state law, IRS regulation, or "any other reason." By July 2012, when GE sent out tens of thousands of SPDs, both the statements were flat out untrue. To the contrary, as Lynch testified, GE—at the highest executive level, with regular briefings of the GE Board—had been working on big changes *for a year*. Pls. Add'l ¶ 3; PSOF ¶¶ 12 & 18.[1] GE was doing so not because costs per participant were increasing—they were falling. Pls. Add'l ¶ 1; PSOF ¶¶ 25, 30. GE was doing it because others were doing it, PSOF ¶ 31, but these other companies had not necessarily made the promises given by GE in Section 5.4. Furthermore, according to Towers Watson, their clients who have moved to a defined contribution model pay a much higher subsidy than GE now does—an average of $1,558, compared with GE's $1,000.

The statement in July 2012 of GE's intent to continue the Plans "indefinitely" was certainly false. As early as February 10, 2012, the GE Board had been presented the plans for major changes and terminations of coverage. PSOF ¶ 24. It is reasonable to infer on GE's motion for summary judgment that the Board gave the go-ahead on these changes in February as GE executives continued to work to plan them and ultimately presented some of them to Board for final approval in September 2012. Other changes considered by the Board in February 2012— like moving every current beneficiary to a defined contribution model—took place later in September 2014. But GE's deceptive conduct in this case involves more than the bizarre timing in re-affirming the promises in Section 5.4 in July 2012—just weeks before the GE Board's action on September 7, 2012. The equal if not worse deception is GE's argument in this case that

---

[1] Throughout this brief, Plaintiffs refer to Plaintiffs' Statement of Facts filed in support of their own motion for summary judgment, Dkt. 81, as "PSOF." Plaintiffs refer to Defendants' Statement of Facts, Dkt. 72, as "DSOF." Plaintiffs refer to their responses to DSOF as "DSOF Resp." Plaintiffs refer to new facts in their Plaintiffs' Statement of Additional Facts, filed contemporaneously with this brief, as "Pls. Add'l."

2

the reassurances in Section 5.4 had been illusory all along. Yes, GE promised the benefits were safe for the long term—but GE had crossed its fingers. Despite being in the SPD, Section 5.4 is not in the Plan, as ERISA contemplates, so GE can now say it was not enforceable. Furthermore—or so GE argues—Section 5.4 does not mean anything. Not only was the statement that GE "intends" not factually true in July 2012—in fact, by at least a year earlier—but GE was likewise misleading or deceptive when it said that it would amend or replace or terminate the Post-65 Plans for the specific examples given in Section 5.4 or "any other reason." That term—"any other reason"—is one that GE regards as a get-out-of-jail-free card. GE seems surprised it may lose this card by the contractual principle of *ejusdem generis,* cited in this Court's opinion of December 30, 2014, Dkt. 35 at 6 (citing *Norfolk & W. R.R. Co. v. Am. Train Dispatchers' Ass'n*, 499 U.S. 117, 129 (1991), but in the context of fiduciary deception, the principle should fittingly apply.

As set out in plaintiffs' opening brief, GE is wrong that these promises in Section 5.4 are illusory as a matter of contract law. To be sure, GE could terminate the Post-65 Plans. Throughout this case plaintiffs have agreed—and understood—that these welfare benefits are not "vested" as ERISA pension benefits are. Indeed, GE could have just had a simple "reservation of rights" clause, so that the "average" participant would have known that there was no security at all to these benefits. *See* 29 U.S.C. § 1022. But GE chose a different and deceptive course. Indeed, GE went so far in its attempts to mislead plaintiffs that it unwittingly used contractually enforceable language in Section 5.4—including a commitment to use its best efforts to keep the Plans in place. The "expects and intends" language—while not using the term "best efforts"—is properly treated as such a promise, one to continue the financial effort GE had been making. And that effort—approximately $1,600 a participant a year by 2012—can be given a definite,

3

ascertainable, contractually enforceable measure. That is, the best effort would be the effort GE had been making when it last reaffirmed its statement of intent in July 2012. Following the sentence with GE's promise of an effort, the next sentence in Section 5.4 is enforceable too—that GE would make changes only for serious reasons like "changes in the law" and "any other reason" like it. Again, this is not a straitjacket: the benefits are not vested like pension benefits under ERISA. But there must be a serious reason—it might be the kind of reason that Dennis Rocheleau gave in his deposition, such as acute financial distress. PSOF ¶ 5. But there is no such reason here. The reason given here, in effect, is: "Some others do it, so we should too." The Lynch letters of September 24, 2012 use vague and loose language about being "competitive" and the "continuing challenge" of health costs. PSOF ¶ 10 & 11. But the evidence shows this is pre-textual. There was a cursory review of the Dow Jones 30, which includes many companies with which GE does not plausibly "compete." Only some of these "peers" used a defined contribution model—about nine—and GE ultimately provided a subsidy far below that of their "peers." PSOF ¶ 49. There is no serious claim that these retiree benefits for salaried employees could have had any serious impact on GE which had a pre-tax profit of $20 billion in 2011, just before making this decision. DSOF Resp. ¶ 36 ("In 2011 GE brought in $147.3 billion in revenues and had $127.2 billion in total costs and expenses").

Finally, GE engaged in a deception by putting these contractual type promises in the SPD, which is only supposed to describe the provisions of the Plans. See 29 U.S.C. § 1022. If it is in the SPD, it is presumptively in the Plans. Since there is no such language in the Plans, and participants were not advised otherwise, this was deceptive.

But even if this deception was not intentional—and on a motion for summary judgment, that fact should be decided in plaintiffs' favor—there is ample undisputed evidence of a fiduciary

4

breach in the duty of care to justify the remedies set out in *Amara* and in *Kenseth*. GE's brief is a *cri de couer* against the Seventh Circuit's decisions in *Kenseth*, which justify those remedies for other serious fiduciary misconduct. And *Kenseth* does apply here. *Kenseth* says that only when "the plan documents are clear *and* the fiduciary has exercised appropriate oversight" is there no fiduciary breach requiring *Amara*-type remedies. *Kenseth I*, 610 F.3d at 472 (emphasis supplied). But at best GE's own view of what Section 5.4 means is anything but "clear." To the contrary, it is at the very least misleading, if not dishonest and deceptive as plaintiffs contend. With or without deceptive intent—GE failed miserably to "exercise appropriate oversight" as required by this Circuit in *Kenseth*. This breach of the duty of care—as imposed by Section 404(a)(1)(B) of ERISA, 29 U.S.C. §1104—is far greater than the misconduct considered by the Seventh Circuit in *Kenseth*. GE made the decision to terminate without even any reference to or knowledge of Section 5.4. As he testified, John Lynch had no idea Section 5.4 even existed until he was deposed in this case. PSOF ¶ 32. Virginia Prostakes—whose Declaration as to Section 5.4 was filed early in this case—says she *did* know about Section 5.4, but could not recall any conversation about Section 5.4 or mention of Section 5.4 in the year or so that the changes were being planned. PSOF ¶ 35.

Most astonishing of all: Lynch testified that not only was he ignorant of the existence of Section 5.4 but if he had known, he would not have told the Board about it anyway. PSOF ¶ 34. Section 5.4 meant that little to him—or to anyone else, like Proestakes, who worked on the changes. To let the GE Board vote to scrap the defined benefits without knowing what GE had been saying about the security of the benefits in Section 5.4 is a fiduciary breach in and of itself. Before making such decisions, GE should at least know what is in its own SPD. The evidence

shows that either GE executives—like Lynch or the Board members—did not know about Section 5.4, or like Proestakes they did not care.

To the "average" participant who received the SPD in the mail during July or August 2012, and then the letters of September 24, 2012, and September 27, 2012, a few weeks later, it seemed that no one cared what GE had been saying to them at all. For this inexcusable misconduct, GE seems happy to create an impression of just gross incompetence, as if that were legally permissible under ERISA. It puts the blame all on Mr. Steve Zarelli, as if no one else at GE had any idea or should have had any idea that tens of thousands of SPDs were at the printer and ready to be sent out. So this is GE's apparent defense to deceptive conduct—namely, it is simply a complete "lack of fiduciary oversight," similar but worse than the conduct in *Kenseth*. But putting aside that Section 5.4 *itself* is deceptive as GE would interpret it now, the publication in July 2012 shows something more than "lack of oversight"—because as Mr. Lynch testified, it made no difference to him. PSOF ¶ 34. Mr. Lynch says that even if he had known about Section 5.4—and he did not—he still would not even have *told* the Board of its existence. PSOF ¶ 34. What the timing and mailing out of the SPDs in July 2012 and the September 2012 letters thereafter really show is that GE did not care what it said to the participants—and that is evidence enough not just of gross incompetence but of dishonesty and bad faith.

Nor is there much point in GE arguing that *Kenseth* is wrongly decided—as GE is desperate now to do. For the record, GE is just flat wrong that *Kenseth I* is in conflict with *Howell v. Motorola*, 633 F3d. 552 (7th Cir. 2011). First, there is dishonesty or deceptive intent here, as described above. Furthermore, *Howell* does not require deceptive intent. Indeed, quoting *Kenseth I*, the Seventh Circuit in *Howell* states that mere negligence is not enough but adds, "'But this does not mean that the duty to convey complete and accurate information is

6

toothless....[A]lthough negligent misrepresentations are not themselves actionable, the failure to take reasonable steps to head off such misrepresentations can be actionable.'" *Id.* at 571-72 (quoting *Kenseth I*, ellipsis and brackets in original).

GE makes a case of "no one knew." Mr. Lynch did not know of Section 5.4. The Board did not know of Section 5.4. Ms. Proestakes did know of Section 5.4, but says she did not know what it meant, and did not bother to ask. PSOF ¶ 36. Indeed, GE itself—like Ms. Proestakes in her deposition—has claimed not to know what the SPD means by "GE." PSOF ¶ 37. But the issue here is not what Lynch or Prostakes or the Board or anyone else "knew," or even what they think the term "GE" means. The issue is what GE as a corporate entity knew. GE—not a GE employee—was the plan administrator. GE as a corporate entity made the assurances in Section 5.4, and GE knew—argues forcefully here—it did not intend them seriously anyway. At the very least, then, GE as a corporate entity "fail[ed] to take reasonable steps to head off" these misrepresentations.

It is bad enough for GE to pin all the blame on Mr. Zarelli, as if it were a defense. It is also mean-spirited. He is a mid-level employee in the communications office of GE's benefit administration organization in Schenectady, New York, well below the level of Ms. Proestakes. He was left to decide on his own—with no one higher up paying attention to what he chose to do. Indeed, the picture presented in his Declaration—which deserves attentive reading—is surreal. Mr. Zarelli says that in July 2012—*at the same time* he is sending the printer a new SPD with the Section 5.4 assurances—he is literally drafting the letters required by 29 U.S.C. § 1024 for plan modifications, telling the *same* participants that the benefits are gone. At the same time he is working on both!

7

Finally, aside from deception—and aside from the breach of fiduciary oversight—GE has engaged in a breach of the duty of "loyalty," imposed by 29 U.S.C. § 1104(a)(1)(A). Mr. Lynch has in effect testified that GE practically had an obligation *not* to consider the interests of the participants. There is no remorse—no balancing of interests, as GE claims in one of its so called "facts." DSOF ¶ 27. Even being "competitive" is not the concern. Rather, according to Mr. Lynch, any time GE can get rid of a cost, any cost, it has an obligation to do so. Specifically, he made this statement:

> Q  But it's your view as I've been describing this…that if there's any way GE can reduce a cost, it will: is that -?
>
> A.  Yeah.
>
> Q.  And should?
>
> A.  That's pretty much right.

Pls. Add'l ¶ 2; DSOF Resp. ¶ 27. In this rare example of candor, there is no interest at GE in striking a "balance" between shareholders and employees. Indeed, as Lynch makes clear, GE should not be counted on to continue the subsidy of $1,000 per participant—because that too is a "cost." If GE can get rid of it, it should—and will.

## II.     While the GE Plans were not vested, the SPD placed contractual limits on when and how GE might terminate the plans.

To GE's argument that Section 5.4 has no meaning, there are several points worth making. First, GE makes much of the fact that a reservation of rights clause appears in the SPD before Section 5.4—and  that Section 5.4 is somewhere in the middle and unlikely to be found. But it is more likely that the "average participant" whose common sense reading is legally privileged under 29 U.S.C. § 1022 would begin with the SPD's table of contents, and turn to the section that interested him. The table of contents of the SPD makes no reference to a reservation

8

of rights. Checking the table of contents, on page 5, upon opening the SPD, the "average" participant would find instead the following:

> 5.0 ADMINISTRATIVE INFORMATION
>
> * * *
>
> 5.4  Can the plans be changed, replaced or terminated?.....p. 58

Pls. Add'l ¶ 5. Yes, GE is right: Section 5.4 is on page 58, but page 5 tells the participant to go to page 58 for all the facts about termination.

According to GE, in a case where a plan administrator did use the word "intend," the Seventh Circuit still found that the benefits are not "vested." *See UAW v. Rockwell Powertrain*, 350 F.3rd 698, 700 (7th Cir. 2010). Plaintiffs have always agreed such welfare benefits are not vested. That's not in dispute. In *Rockwell,* the Court did not address the question as to whether the Fund had or had not made a "best effort"—and the UAW apparently made no such argument. Nor did it hold that the language was meaningless. As the Seventh Circuit has since stated in *Sullivan v. CUNA Mutual Ins. Society*, 649 F.3d 553 (7th Cir. 2011)—and  as this Court itself has pointed out in this case—the purpose of any contractual interpretation is to reconcile *all* parts of the language in a provision like Section 5.4. Decision and Order of 12/30/14 at 5-6 (Dkt. 35). Plaintiffs' interpretation of Section 5.4 does give meaning to all of it. GE's does not.

GE also insists there is no limitation placed on it when it assures participants that GE will "amend" or "replace" or "terminate" the GE Medicare Plans only for "changes in federal or state law," or "IRS regulations," or "any other reason." According to GE, the last or residual term— "any other reason"—lets it terminate as well for no reason, or the most trivial reason, or a self-serving reason. Of course this violates the principle of *ejusdem generis*—and it also allows GE as a fiduciary to sneak one past the "average participant," who may innocently read it in the way the principle requires. But GE says its interpretation makes sense in the context—so let us consider

9

the context. The statement in question comes just after the reservation of rights, or so-called "ROR," the claim of an absolute right to cancel. In context, the only sensible purpose of the next sentence is to limit the ROR—that is, to assure that despite the language, it will not be used in that literal way. Otherwise, the sentence has no function or purpose. GE has already stated that it can amend or terminate for "any reason," so the next sentence has to be there as a qualification, and should be read as such. Indeed, GE lists these specific examples, and says "*or* any other reason." As GE wants to read it, the sentence should really say: "GE may amend, replace or terminate for changes of federal or state law, or IRS regulation, or ERISA, *but* it may terminate for *any* reason." GE itself chose to bring the sentence squarely under the principle of *ejusdem generis*, and then tries to say it means nothing. It is fair to read the section the way GE wanted the average participant to think of it as a qualification, and it should be so read by this Court.

GE contends that in the case of *In re Unisys Corp. Retiree Med. Benefits ERISA Litig.,* 837 F. Supp. 670 (E.D. Pa. 1993), the district court had a different interpretation for similar language. But the district court did not even refer to the principle of *ejusdem generis*, which this Court has already found applicable. Nor is it clear that the use of the principle was argued or considered. Nor does the district court offer any explanation of its decision under that principle. There is no appellate authority to excuse the application of this principle to Section 5.4, when it is hard to imagine the purpose of this sentence except to reassure participants.

Finally, GE argues unpersuasively that GE's prior changes in benefits described in the GE Handbook should have alerted them that Section 5.4 should not be taken literally. For example, in a letter from Lynch dated December 10, 2007, GE required new participants turning 65 after 2008 to pay ten percent of the plan costs. But the Lynch letter justifies the change as

allowing GE to continue providing the GE Benefit Plans. In this 2007 letter received by both Kauffman and Rocheleau, Lynch states:

> …GE remains committed to the people, current and retired, who have devoted years to making us a global leader. Although the health benefits of future GE retirees will be somewhat different than today, they will continue to be among the best available from any company.

Pls. Add'l ¶ 6.

In these earlier changes, participants could reasonably believe that GE was trying not to recoup money—as it sought to recoup more than $1 billion in the 2012 and 2014 health care changes—but only *continue* to provide the same financial effort as below. Furthermore, the past changes referred to by GE are modest as far as the participants are concerned. They had no impact at all on those currently receiving benefits, and very little on those who were already eligible and would soon receive them. Some of the changes actually did reflect changes in Medicare. Even if the changes violated Section 5.4 technically, they were not substantial breaches like those complained of here. Besides, under 29 U.S.C. § 1022, Section 5.4 should be read as the "average" participant would have done so or at least as Rocheleau and Kauffmann did—not as putting a straitjacket on GE, but as promising to deliver the fundamental program except in "life threatening" situations. PSOF ¶ 5. No reasonable person would sue or feel betrayed by such a minor change—as described in the December 10, 2007 letter—when GE accompanies it with a pledge to continue with the Plans.

## III.    Plaintiffs and other participants did suffer injury from the cancellation of the GE Plans.

It is something close to legal hubris to argue that GE cancelled Plan health care obligations worth more than a *billion* dollars in the long run, but that participants will never suffer any harm. *See* PSOF ¶ 59. First of all—as a matter of plain common sense, as well as

11

GE's effective admission—Evelyn Kauffman suffered harm. Laurence Baker—GE's own expert—says quite plainly that participants like Kauffman suffered injury. Baker begins with the claim that "GE had a limited set of options if it wanted to decrease or maintain its health care costs." Dkt. 77-1 at ¶ 18. Actually, Baker is wrong here: if GE wanted to "contain" costs at the current level, it had a very good option—just continue the same Plans in effect and cap GE's costs at the current contribution level. By the way, Baker seems unaware that in briefings to the Board, GE reported that its costs were dropping. Pls. Add'l ¶ 1; PSOF ¶¶ 25 & 30. To "contain" costs, GE had to do nothing. At any rate, to reduce or contain costs, Baker in his report lists the alternatives as follows:

> For example, GE could have stopped providing health care coverage for retirees altogether; it could have shifted more of the costs to retirees through increased premiums or costs sharing; or it could have switched to a defined contribution model...The first two paths would certain have saved GE money, but would have had the effect of *harming all retirees.*

Dkt. 77-1 at ¶ 18 (emphasis supplied).

But in the case of Evelyn Kauffman GE *did* take the "path" of stopping coverage entirely. And Baker agrees that such a participant would be harmed. Also, according to Baker, there are 9,638 retirees who were like Evelyn Kauffman, and so by his testimony, all 9,368 of them have suffered harm.

Furthermore, Baker agrees that an increase in cost-sharing would injure everyone. But in September 2012 GE did exactly that—dramatically increase the cost sharing for Rocheleau and others. Of course GE later switched in 2014 to a defined contribution model, but no one at GE did so out of concern for the injury inflicted in 2012. GE did so motivated by IBM's decision to move to defined contribution model. PSOF ¶ 42. Indeed, according to Proestakes, what IBM did to its retirees in 2013 made the GE action in September 2012 look "lame." PSOF ¶ 44.

12

In yet another way, however, Baker's report is even more damning to GE's case. In estimating the financial losses of participants, Baker is quite explicit that it is impossible to tell which individuals will be worse off under the defined contribution model. Dkt. 77-1 ¶ 22. In the respect of this "unknowable," everyone is worse off—because every participant is now at greater risk in a worst case event. No one can be sure of what one's health will be. When Baker or David Speier argue that "smart shoppers" can save, they are assuming that GE retirees have a clairvoyant knowledge of what in the next year their health condition in the future will be. DSOF Resp. ¶ 80. In doing so, they ignore why people purchase insurance—or seek insurance as a benefit, even if unlikely to be used; it is valuable not because participants can predict the future like a "smart shopper," but because they cannot.

Indeed, throughout this case, starting with the Declaration of David Speier—and his references to retirees who make "good financial choices" who have perfect foreknowledge of what their health next year will be—GE seems not to realize that the purpose of insurance is to insure. Contrary to Speier its real value is to insure not against the most likely or known but the unknown or unexpected—a medical event *unlikely* to occur. In *Amara,* the Supreme Court states: "[M]ost individuals are risk adverse." *Amara, supra,* 563 U.S. at 430. The value of insurance, as noted by plaintiffs' expert, Gerald Friedman, is risk aversion. As the Seventh Circuit has stated: "The usual purpose of insurance is to shift risk from an individual...[who] is risk averse, and so would prefer to substitute a cost certain (a fixed insurance premium) for the risk of incurring a larger costs...." *Adams v. Plaza Fin. Co.,* 168 F.3d 932, 934 (7th Cir. 1999). In truth, most people will "save" money if they pay nothing in premium, and go without insurance at all—whether car, casualty, or even health. It is, after all, highly unlikely that one's house will burn down—but sensible people still pay premiums to protect against this highly unlikely "worst case." Indeed,

13

even Baker impliedly acknowledges that insurance has value, regardless of whether or how much one ends up using it, when he states that eliminating coverage entirely would have necessarily harmed *all* retirees. Baker is acknowledging that Kauffman is harmed even though she now has a zero-premium plan and she has not yet experienced the type of health event that would make the GE Medicare Plans more cost-effective.

The common injury that GE has inflicted on every member of the class is not just or only higher out-of-pocket costs for drugs for an ever-changing group in the unlucky "22 percent" that Speier identified but the lost value of a defined benefit protection for everyone. Plaintiffs have lost the security of averting the kind of risk that no "smart shopper" can ever predict. In this case, GE itself has put forward a Declaration that even in terms of out-of-pocket losses, 22 percent of the participants will be worse off in any given future year. As Baker admits, it is just impossible to say which ones they are. But again, that estimate is only for a given year. It may be a different 22 percent in the following year, as GE concedes. DSOF ¶ 80 n.7; DSOF Resp. ¶ 80. So the injury will be a rolling one, hurting more participants as the years go by in terms of actual out of pocket losses.

Nor is it true that the fortunate ones—who do not have serious health problems—will benefit. They will still lose the assurance of defined benefit coverage, which put the risk on GE. Besides, even before the movement to a "mandatory" defined contribution, GE already offered participants the chance to go on to the commercial market with a direct subsidy. But few participants took that option. Pls. Add'l ¶ 4. They saw the value of averting risk, or saw no point trying to chance less coverage than they could have in the GE Plans.

Finally, plaintiffs cannot count on the $1,000 subsidy, on which Baker's expert report on future injury is based. Baker himself cannot say how long the GE subsidy will continue. The

14

assurances of Section 5.4 are gone. Tomorrow, the subsidy of $1,000 may be gone. As quoted above, Lynch—in his deposition—has made clear that if it can cut any cost, it *should* do so. Pls. Add'l ¶ 2. Every participant is at the risk of ending up like Evelyn Kauffman, despite years of contrary assurances.

GE's argument that Rocheleau paid less in 2015 than in 2014 illustrates the fallacy of GE's case. Of course Rocheleau paid more in 2014—he required more medical care in 2014 than in 2015. GE has also claimed at various times that Rocheleau paid a smaller premium in 2015 than in 2014. That is also untrue. Rocheleau testified in his deposition—and explained in detail—why his out-of-pocket cost for coverage increased from 2014 to 2015. DSOF Resp. ¶¶ 144-45 & 147. In any case, plaintiffs contend that the relevant point is that he and other participants are at greater risk under a defined contribution plan than under a defined benefit plan where GE bears the risk.

## IV. GE's deceptive conduct—the fiduciary breach in and of itself—has harmed participants.

GE continues to deny that the deceptive or misleading conduct described above harmed the participants. It did cause harm. In the opening brief, plaintiffs were specific as to the harm— the loss in other compensation they might otherwise have had, as well as just the loss of the honest fiduciary oversight or service to which ERISA entitles them. *See* Pls. Memo., Dkt. 80, at pp. 12-15. Suffice it to say that Section 5.4 made real contractual-type promises, and it may be presumed that GE did not make those promises gratuitously. It was presumably justified in GE's view to get the kind of qualified employee GE wanted. Accordingly, GE put in section 5.4 as an inducement to such an employee—that is, to be competitive in attracting them. Given GE's claims in this case that it has to adjust its benefits to be competitive, it must be presumed that Section 5.4 had a competitive business purpose. For such a purpose, GE put these limits on its

right to terminate. Had it not done so, GE would have had to offer something else to be competitive. In other words, GE believed that it was getting something for Section 5.4—a break on salaries, or a better kind of employee. GE obtained *some* economic benefit from Section 5.4. On the other hand, the participants got nothing. *Amara* does not require any additional or specific "detrimental reliance"—or any more harm than that.

Furthermore, Section 5.4 *did* create contractual-type rights, and from the deprivation of such contractual rights, injury can be presumed.

**V.     It is false that to be "competitive," GE had to renege on Section 5.4 and cancel the Plans.**

In the letter of September 24, 2012 sent to Kauffman and others like her not yet 65, Lynch states as follows:

> Dear GE Benefits Participant,
>
> * * *
>
> The Company is taking this action to remain competitive now and into the future, as fewer companies offer such coverage and the cost of health care continues to be a challenge the Company must address.

Add'l Facts ¶ 7.

As pointed out in plaintiffs' opening brief, GE hardly needed to cut retiree benefits for GE to remain "competitive." First of all, GE never consistently said what it means by being "competitive"—if it means "competitive" in inducing people to come to GE, then perhaps it need not offer the benefits to be "competitive" in the future. But Rocheleau and Kauffman are retirees—not prospective employees for whom GE is bidding. GE is not competing with either IBM or any other Dow Jones 30 company to "attract" the "right kind" of retiree.  If GE means "competitive" in product markets, the amount "saved" annually is too small to have any effect on product prices. Nor has GE made such a claim.

But these changes are not about being "competitive" in any sense. Only nine of the Dow Jones 30 had defined contribution plans, while 13 had defined benefit plans. PSOF ¶ 47. But GE did not care to match the costs of those "peers" that were moving to defined contribution models. In fact, as Towers Watson pointed out, it was lower than average—GE was in the bottom 15 percent of those offering defined contributions. PSOF ¶ 49. To be sure, Proestakes testified that $1,000 was appropriate enough to replace the kind of plan GE offered. But in saying so, GE effectively admits it was offering a less "rich" plan than other so-called "peers" or "competitors" who used the defined contribution model. Towers Watson told GE that the average subsidy of its other clients was $1,558. PSOF ¶ 49. By going much lower to $1,000, unlike the other clients of Towers Watson, it seems that GE was just much greedier than its peers. Indeed, as discussed below, it is approximately this Towers Watson "average" that plaintiffs seek as a remedy in the form of a surcharge.

Furthermore, the scale of the costs for retiree health compared to other GE costs here belies any true concern about "competitiveness." In 2011, the costs of the program were approximately $660 million for pre- and post-65 retirees, including non-salaried retirees not included in the plaintiff class. Pls. Add'l ¶ 9. But GE's annual expenses that year—all its costs— were in the range of $127 *billion*. Pls. Add'l ¶ 8. As a 0.5 percent of the cost of doing business, the cost of retiree health for people who gave career-length service was negligible. In terms of "balancing the interests of stockholders and employees," Scrooge himself would have blushed to do what GE has done to its retirees.

## VI. Ms Kauffman was a participant.

It is a little much for GE to deny that Ms Kauffman was a participant when by letter of September 27, 2012, GE told her she was a participant. Add'l Facts ¶ 7. That letter—sent to Kauffman and others like her—starts out as follows:

17

> Dear GE Benefits *Participant*,
>
> Effective January 1, 2015, GE's post 65 health benefit plans will
> be amended as outlined in this letter.

Add'l Facts ¶ 7 (emphasis added).The letter concludes that as a participant she will actually receive an update in her Handbook:

> You will receive updates to *Your Benefits Handbook* providing
> further details on these amendments.

Add'l Facts ¶ 7 (emphasis in original).

The letter was in compliance with 29 U.S.C. § 1024, which requires GE to advise participants of any "material modification" of the Plans. If Kauffman was deemed by GE a participant entitled to notice of a material modification under 29 U.S.C. § 1024, she would have been entitled to the SPD in the first place under 29 U.S.C. § 1022.

Furthermore, the Court has already determined that Kauffman is a participant. Decision & Order of 6/5/2015, Dkt. 49, at 5-6. As plaintiffs pointed out in briefing on the motion for a preliminary injunction *and* the motion to dismiss, the SPD she did receive—Health Choice, for those retired but not yet 65—advised her to consult the Handbook for her rights under the Post-65 Plan. DSOF Resp. ¶ 25; *see also* Pls. Supp. Br., Dkt. 32, at 1-2; Pls. Sur-Reply, Dkt. 50, at 5. She was already eligible for benefits under that Plan—since she was eligible for benefits under the Health Choice Plan. All she had to do was to live—that is, to turn 65.

The Secretary's regulations make clear that she was a participant. As set out in 29 C.F.R. § 2520.104b-2, GE has to send an SPD to "each participant covered under the plan (as defined in 2510.3-3(d))[.]" In relevant part that section defines a "participant" in a "welfare benefit plan" as follows:

> An individual becomes a participant covered under the welfare
> benefit plan on the earlier of -

> (B) The date on which the individual becomes eligible under the plan for a benefit subject only to occurrence of the contingency for which the benefit is provided.

29 C.F.R. § 2510.3-3(d)(1)(i)(B).

Ms Kauffman was *already* receiving a post-retirement health benefit in the Health Choice Plan for pre-65 retirees. She would automatically have been placed in the GE Medicare Plan for post-65 retirees as soon as the relevant contingency—living to 65—had occurred. And in fact GE was sending her a pre-65 retiree SPD that advised her to consult the post-65 SPD as to the rights that she would have at that time. Nothing in the Labor Department publication cited by GE says anything to the contrary.

Finally, there is no merit to GE's argument that by unlawfully cancelling Kauffman's rights as a participant, GE has removed Kauffman's standing to challenge such an illegal act. No case so holds, and GE misstates *Winchester v. Pension Committee of Michael Rees Health Plan*, 942 F.2d 1190 (7th Cir. 1991). In that case, Ms. Winchester had accepted a lump sum pension payment, which ended her status as a participant. Two years *later*, she sought to obtain certain plan documents under the disclosure provisions of ERISA—arguing that somehow she remained a participant. The Court emphasized that Ms. Winchester was not seeking a plan benefit, but a penalty provision for denying a request for plan documents years after she had left the plan. *Id.* at 1193. The holding here expressly did not apply to denial of a benefit claim, such as Kauffman has brought here. Furthermore, it would be bizarre if GE could unlawfully remove a participant and then claim that *ipso facto*, the participant so wronged could not sue for a fiduciary breach. In *Shahid v. Ford Motor Co.*, 76 F.3d 1404 (6th Cir. 1996), the Court found standing for an employee to sue as a "participant" of a welfare benefit plan, even though the defendant Ford Motor Company had removed his eligibility by firing him. As the Court in *Shahid* stated, "a former employee has standing as a 'participant' where, but for the alleged

19

misrepresentations or breaches of duty by fiduciaries, the employee would have been in a class eligible to become a member of the plan." 76 F.3d at 1410. Significantly, in that case, the Sixth Circuit found that under the Secretary's regulation cited above, the employee was a "participant" in a severance pay plan, even though the triggering event for eligibility, i.e., a layoff, had not yet occurred at the time of his discharge.

In any case, Kauffman was well aware of the SPD—she worked with the SPD, and indeed, as she testified, she went over the provisions of the SPD, including Section 5.4—to GE employees who were about to retire. PSOF ¶ 6. No one knew Section 5.4 better than Kauffman. She saw it, read it, worked with it many times. It was part of her job as a retirement counselor to know about Section 5.4. Even if that were not the case, she would not have to show detrimental reliance—she could rely on her fellow retirees to tell her of Section 5.4. *Amara*, 131 S. Ct. at 1881.

## VII.    For GE's misconduct, reformation and surcharge are fitting remedies.

GE rejects the holding in *Kenseth* that fiduciary misconduct short of fraud justifies the use of equitable remedies like reformation and surcharge. But *Kenseth* is the law, and GE did engage in dishonesty and deception. Plaintiffs are therefore entitled to reformation—that is, an order to "reform" the GE Medicare Plans to include the same contractual-type obligations of Section 5.4, which GE has breached. However, plaintiffs do *not* seek such reformation in order to reinstate the Medicare Plans, in a manner consistent with the promises of Section 5.4 of the SPD. Notwithstanding the breach, plaintiffs recognize the confusion that reinstatement of the defined benefit obligations would now create. Rather, plaintiffs seek surcharge against GE—the trustee—to recover for the participant class at least some of the profit that GE has obtained from the breach. Even in *Amara*, a surcharge is not limited to fraud or deception, but to any fiduciary violation which results in unjust enrichment. As the Supreme Court stated in *Amara*, "The

surcharge remedy extended to a breach of trust committed by a fiduciary encompassing *any* violation of a duty imposed upon that fiduciary. 563 U.S. at 442 (emphasis supplied, citations omitted).

GE argues that the plaintiffs are not entitled to a surcharge because they are unable to show how they were harmed. This is essentially a rehashing of GE's earlier arguments about harm. But as set forth above, and in plaintiffs' response to GE's statement of facts, the plaintiffs—and all class members—were harmed. First, they were harmed by GE's misleading statements, which denied them the right to the loyal, honest services of a fiduciary—a right to which they are entitled under 29 U.S.C. § 1104(a)(1). See *Amara*, 131 S. Ct. at 1881 (holding that harm "might…come from the loss of a right protected by ERISA or its trust-law antecedents"). They also suffered a loss of their right to an accurate, non-deceptive SPD, especially as to the security of their benefits. See *id.* (recognizing harm caused by failure to provide proper summary information); *see also* Decision & Order of 6/5/15 (Doc. # 49) at 5 (same). But finally, plaintiffs were harmed because they suffered a loss of insurance—that is, protection against future risk. GE is right that the plaintiffs are not suing over the loss of particular payments of particular claims for particular medical procedures or drugs. Instead, they are suing over this loss of protection. Plaintiffs are accordingly requesting a remedy that corresponds to this harm—that is, protection against future risk. Plaintiffs would prefer to have the defined benefit that protected them before, but they realize that is no longer a realistic possibility. Instead, they seek protection in the form of a defined contribution—but one that more closely tracks the benefit that GE was providing them before. One that requires GE to expend its "best efforts," as Section 5.4 required. In other words, plaintiffs are seeking lost health benefits

21

as damages, but rather an equitable remedy that approximates reinstatement of a benefit protected by ERISA.

Nor is the amount of the surcharge limited by the out-of-pocket loss of the participants, anyway. To the extent GE implies that it is so limited to such "harm," GE is simply wrong. To the contrary, a surcharge can apply to recover any kind of unjust enrichment, regardless of the out-of-pocket losses of the participants. In *Merrimon v. Unum Life Ins. Co. of Am.*, the Court noted, that participants can suffer "tangible harm even if no economic loss results." 758 F.3d 46 (1st Cir. 2014) (citing *Restatement (Third) of Restitution and Unjust Enrichment* § 3 reporter's note a (2011); *Amara*, 131 S. Ct. at 1881; *see also Kenseth II*, 722 F.3d at 881-82 and n.4 (citing *McCravy* and compiling cases regarding disgorgement of profits resulting from breach in order to avoid "perverse incentives"). GE's own brief cites Ninth Circuit case law that justifies the use of a surcharge upon the trustee for the amount by which the trustee is unjustly enriched. *See, e.g., Gabriel v. Alaska Elec. Pension Fund,* 773 F.3d 945 (9th Cir. 2014). That measure is also appropriate here because as Laurence Baker has stated, the individual participants who will be most harmed cannot be identified at this time.

Accordingly, the particular surcharge sought consists in an order to "pay out" the surcharge over a five-year period in the form of an increase in the financial assistance available in the Retiree Reimbursement Account (RRA). GE is currently providing a subsidy of $1,000. As set out in the opening brief, plaintiffs seek an increase to $1,600 at least until after the Medicare "doughnut hole" gap for drug coverage has been closed. Plaintiffs submit that a longer pay out is appropriate for those participants who in 2021 are 80 years old or older—that is, an order barring an abrupt cancellation of coverage for those participants who are most likely to

have greater medical needs. Such a surcharge will still leave GE with a substantial profit from its unlawful act.

## Conclusion

For all the reasons given above, plaintiffs request that this Court deny GE's Motion for Summary Judgment and grant Plaintiffs' Motion for Summary Judgment.

Dated: July 18, 2016                                    Respectfully submitted,

                                                          s/ Sean Morales-Doyle
                                                        One of Plaintiffs' Attorneys

Thomas H. Geoghegan
Michael P. Persoon
Sean Morales-Doyle
Carol T. Nguyen
Despres, Schwartz & Geoghegan, Ltd.
77 West Washington Street, Suite 711
Chicago, Illinois 60602
(312) 372-2511

23