**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**
**MILWAUKEE DIVISION**

| | | |
|---|---|---|
| Evelyn Kauffman and Dennis Rocheleau, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 14-cv-1358 |
| | ) | |
| v. | ) | The Honorable Lynn Adelman |
| | ) | |
| General Electric Co., | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFFS' CIVIL LOCAL RULE 56(b)(2)(B) RESPONSE**
**TO DEFENDANT'S STATEMENT OF FACTS**

**Civil Local Rule 56(b)(2)(B)(i) Response to Defendant's Facts**

Plaintiffs offer the following response to GE's statement of facts. Plaintiffs include GE's headers for the sake of convenient reference to the original statement but do not offer admissions or denials of any representations contained in the headers as they are not proper statements of fact under the local rules.

**I.     Background**

1.     The federal health insurance program known as Medicare provides primary healthcare coverage for Americans age 65 and older. (Dkt. 31, Corrected Declaration of Virginia D. Proestakes ("Proestakes Decl.") ¶ 3.)

**ANSWER: Admitted.**

2.     Medicare has multiple parts. Medicare Part A covers inpatient hospital stays, care in a skilled nursing facility, hospice care, and some home health care. Medicare Part B covers physician services, outpatient care, medical supplies, and preventive services. Medicare Part C, also known as Medicare Advantage, is a type of Medicare plan offered by a private company to

1

provide Part A and Part B benefits. Medicare Part D provides outpatient prescription drug insurance. (Dkt. 31, Proestakes Decl. ¶¶ 4-7.)

**ANSWER: Admitted.**

**II.     The GE Medicare Plans**

3.      GE historically offered supplemental medical and prescription drug plans to salaried retirees who had reached age 65 (the "GE Medicare Plans"). (Dkt. 58, Pls.' Am. Compl. ¶¶ 13-14; Dkt. 31, Proestakes Decl. ¶ 3.)

**ANSWER: Admitted.**

4.      The GE Medicare Plans had four components: (a) the GE Medical Care Plan for Pensioners ("GE Medicare A Plan"), (b) the GE Pensioners Hospital Indemnity Plan ("GE Hospital Plan"), (c) the GE Pensioners Prescription Drug Plan ("GE Drug Plan"), and (d) the GE Medicare Insurance Plan for Part B Benefits ("GE Medicare B Plan").[1] Together, the GE Medicare Plans covered prescription drugs as well as certain costs not covered by Medicare for eligible medical care and hospital visits. (Dkt. 31, Proestakes Decl. ¶ 9.)

**ANSWER: Admitted.**

5.      Although GE sponsored the GE Medicare Plans, the retirees paid 100% of the costs of coverage for the GE Hospital Plan and the GE Medicare B Plan, while GE and retirees shared the costs for the GE Medicare A Plan and the GE Drug Plan to varying degrees depending on the retiree's years of service and the date on which he or she turned 65. (Dkt. 31, Proestakes Decl. ¶ 9; Deposition of Dennis Rocheleau ("Rocheleau Dep.") at 122:15-24, filed as Exhibit 1 to Declaration of Matthew J. Sharbaugh.)[2]

---

[1] In prior Court filings, GE referred to these Plans by their acronyms: (a) MCPP, (b) PHIP, (c) PPDP, and (d) GEMIP.

[2] Relevant deposition excerpts, discovery responses, and discovery documents are being filed as exhibits to the Declaration of Matthew J. Sharbaugh ("Sharbaugh Decl."), filed herewith.

2

**ANSWER: Admitted except to the extent this statement implies that all participants in the GE Medicare A Plan and GE Drug Plan shared in the premiums paid for those plans. Certain retirees, including Dennis Rocheleau, paid no premiums. GE paid 100% of the premiums for retirees, including Dennis Rocheleau, who turned 65 prior to January 1, 2009 and who had fifteen or more years of service for GE at the time of retirement. Speier Decl., Dkt. 21, at ¶ 16.**

6.    Some GE retirees, including Rocheleau, obtained Medicare supplement coverage through the Elfun Medical Benefits Plan ("Elfun Plan") sponsored by an organization of retired GE executives called the Elfun Society. The Elfun Plan provided benefits similar to the Medicare B Plan but was never a part of the GE Medicare Plans. Retirees paid the full cost of coverage under the Elfun Plan. (Dkt. 31, Proestakes Decl. ¶ 44; Rocheleau Dep. at 122:25-123:7.)

**ANSWER: Denied that the Elfun Society was an organization of retired GE executives. The Elfun Society was an organization of GE's employees and retirees. It was not limited to executives or retirees. *See* Dkt. 31-5, Ex. E to Proestakes Decl., at 12 (noting that employees could join the Elfun Society prior to retiring, that retired Elfun Society members are referred to as "senior members," and that members could be salaried exempt, salaried non-exempt, or hourly employees). Otherwise admitted.**

## III.    The Plan Documents Reserve GE's Right to Change or Terminate the GE Medicare Plans At Any Time

7.    The Medicare A Plan and the Drug Plan were part of the GE Life, Disability and Medical Plan. The GE Life, Disability and Medical Plan contains the following reservation of rights language:

> Amendment or Termination

3

> This Plan may be amended, suspended, or terminated by the Board of Directors, in whole or in part, at any time without limitation, except as may be otherwise provided in collective bargaining agreements and except further that no such amendment, suspension, or termination shall adversely affect to a material degree any short term disability benefit payable with respect to any sickness, injury, or Covered Medical Expenses incurred prior to the effective date of such amendment, suspension, or termination, or affect the amount of GE Life Insurance Benefits and/or Trust Death Benefits for those employees who have retired, as described in Part I, Section D.

(Dkt. 31, Proestakes Decl. ¶¶ 10-11; Dkt. 31-1, Ex. A to Proestakes Decl., Part IX(F), pages 159-176.)

**ANSWER: Admitted.**

8. The plan documents for the Medicare B Plan and Hospital Plan contain similar reservation of rights language:

> AMENDMENT OR TERMINATION
>
> This Plan may be amended, suspended, or terminated by the Board of Directors of the Company, in whole or in part, at any time without limitation, except as may be otherwise provided in collective bargaining agreements and except further that no such amendment, suspension, or termination shall adversely affect, to a material degree, any benefit payable with respect to any confinement which commenced prior to the effective date of such amendment, suspension, or termination.
>
> The carrier has reserved the right to terminate the Plan upon 90 days advance written notice subject to the above provisions.

(Dkt. 31, Proestakes Decl. ¶¶ 12-15; Dkt. 31-2, Ex. B to Proestakes Decl., Section VI, page 5; Dkt. 31-3, Ex. C to Proestakes Decl., Section IV, page 8.)

**ANSWER: Admitted.**

4

**IV. The SPDs for the GE Medicare Plans Also Reserve GE's Right to Change or Terminate the GE Medicare Plans At Any Time**

9.     In compliance with ERISA, GE periodically issued summary plan descriptions ("SPDs") describing the benefits available under the GE Medicare Plans. GE issued separate SPDs to different groups of retirees, depending on the plans under which they were covered or were receiving benefits. (Dkt. 31, Proestakes Decl. ¶ 16; *see also* Deposition of Virginia Proestakes ("Proestakes Dep.") at 15:22-16:2, filed as Exhibit 4 to Sharbaugh Decl.)

**ANSWER: Plaintiffs admit the statements of fact in this paragraph, but to the extent the opening clause implies that GE properly or fully complied with the requirements of ERISA, it is a conclusion of law that does not require a response, and Plaintiffs offer none.**

10.     In July 2012, GE issued updated SPDs to retirees who were covered by the GE Medicare Plans. (Declaration of Steve Zarelli ("Zarelli Decl.") ¶¶ 6, 11-12, filed herewith.)

**ANSWER: Admitted that in July 2012 GE issued updated SPDs to retirees who were receiving benefits under the GE Medicare Plans at that time. The parties dispute who is properly considered a "participant covered under" the GE Plans pursuant to ERISA and have set forth their positions on that legal question in their briefs. As set forth in Plaintiffs' contemporaneously filed brief, they argue that Kauffman was a participant covered under the GE Plans even in 2012, prior to turning 65 years old. *See* Pls. Br. in Opposition at § VI. As set forth in Defendants' paragraph 13 below, GE did not send the updated SPDs in question to Kauffman. For this reason, Plaintiffs deny this statement to the extent that it implies that GE issued updated SPDs in July 2012 to *all* retirees who were covered by the GE Medicare Plans.**

11.     One of those SPDs was entitled "Your Benefits Handbook, GE Pensioner Health Care Options at Age 65 (includes the Elfun Medical Benefit Plans), Effective January 1, 2012," with the identifier "RELF-12" on the back cover. (Dkt. 31-5, Ex. E to Proestakes Decl.) GE will refer to this SPD throughout as the "July 2012 SPD."[3]

**ANSWER: Admitted.**

12.     The July 2012 SPD is the SPD Rocheleau received. (Rocheleau's Resps. to GE's First RFAs, Nos. 5-6).

**ANSWER: Admitted.**

13.     Kauffman did not receive the July 2012 SPD. (Kauffman's Resps. to GE's Second RFAs, Nos. 9-10, filed as Exhibit 8 to Sharbaugh Decl.)

**ANSWER: Admitted.**

14.     The July 2012 SPD contains the following statement on the cover: "This Handbook is valid only if you receive it directly from US Employee Services with a cover letter indicating that it applies to you." (Dkt. 31-5, Ex. E to Proestakes Decl.)

**ANSWER: Admitted.**

15.     Kauffman admits she did not receive a cover letter from GE U.S. Employee Services indicating that the July 2012 SPD applied to her. (Kauffman's Resps. to GE's Second RFAs, No. 11.)

**ANSWER: Admitted.**

16.     The July 2012 SPD contains the following language on the first page:

---

[3] Plaintiffs attached to the complaint a handbook entitled "Your Benefits Handbook, GE Pensioner Health Care Options at Age 65, Effective January 1, 2012," with the identifier "RHCA-12" on the back cover. (Dkt. 1-1, Ex. A to Compl.). Neither Kauffman nor Rocheleau received this SPD, however. (Rocheleau's Resps. to GE's First Reqs. for Admis. ("RFAs"), Nos. 5-6, filed as Exhibit 9 to Sharbaugh Decl.; Kauffman's Resps. to GE's Second RFAs, Nos. 6-8.) RHCA-12 contains the same language as the July 2012 SPD, referenced in paragraphs 13 and 14. (Dkt. 1-1 at 1, 48.)

IMPORTANT INFORMATION ABOUT THIS HANDBOOK

The Board of Directors of General Electric Company reserves the right to terminate, amend, eliminate or replace the GE Medicare Benefit Plans and any related program, plan or benefit at its discretion and at any time ….

* * *

If a provision described in this handbook differs from the provisions of an applicable plan document, the plan document prevails.

* * *

Eligibility for these plans is based on the provisions in effect at the time of your retirement or termination.

(Dkt. 31, Proestakes Decl. ¶¶ 25-26; Dkt. 31-5, Ex. E to Proestakes Decl., p. 1.)

**ANSWER: Admitted.**

17.     The July 2012 SPD further states in Section 5.4:

5.4 CAN THE PLANS BE CHANGED, REPLACED OR TERMINATED?

GE expects and intends to continue the GE Medicare Benefit Plans described in this handbook indefinitely, but reserves the right to terminate, amend or replace the programs or plans, in whole or in part (subject to applicable contractual requirements), at any time and for any reason, by action of the Board of Directors of General Electric Company or such persons as it may designate.

A decision to terminate, amend or replace a plan may be due to changes in federal law or state laws governing qualified retirement or welfare benefits, the requirements of the Internal Revenue Service, ERISA or any other reason. A plan change may include transferring all or a portion of plan assets and debts to another plan (which may be maintained by a successor employer or some other unaffiliated entity) or splitting a plan into two or more parts.…

(Dkt. 31-5, p. 58.)

**ANSWER: Admitted.**

18.     The phrase "GE expects and intends to continue the GE Medicare Benefit Plans described in this handbook indefinitely" has appeared in SPDs for the GE Medicare Plans since at least 1992. (GE's Resps. to Pls.' Second Set of Interrogs., No. 3, filed as Ex. 7 to Sharbaugh Decl. (referring to SPDs from 1992-2012 containing the phrase); *see also* Deposition of Evelyn Kauffman ("Kauffman Dep.") at 74:3-75:11 (acknowledging that the language has been in SPDs for "a very long time," since the 1980s or 1990s), filed as Exhibit 2 to Sharbaugh Decl.; Rocheleau Dep. at 196:4-15 (recognizing that the language had been in prior SPDs).)

    **ANSWER: Admitted.**

**V.     The SPD for the GE Health Choice Plan, Which Is the Plan in Which Plaintiff Kauffman Was Enrolled, Did Not Contain the "Expects and Intends" Language**

19.     At all times relevant to this case, GE salaried retirees who had not yet attained age 65 were able to purchase coverage under the GE Health Choice Plan, which is the same plan that covers salaried active employees. The GE Health Choice Plan is not the subject of Plaintiffs' complaint. (Dkt. 31, Proestakes Decl. ¶ 46; Kauffman Dep. at 15:3-16:7; Kauffman's Resps. To GE's Second RFAs, Nos. 4-5.)

    **ANSWER: Admitted.**

20.     In July 2012, Kauffman was retired but had not yet turned 65, and was enrolled in the GE Health Choice Plan (not the GE Medicare Plans). (Kauffman's Resps. to GE's Second RFAs, Nos. 1-2, 4-5.)

    **ANSWER: Admitted.**

21.     In July 2012, GE issued an SPD to persons enrolled in the GE Health Choice Plan, entitled "Your Benefits Handbook, GE Health Care Benefits, Effective January 1, 2012," with the identifier "HCCO-OM-12" on the back cover ("Health Choice SPD"). (Dkt. 31-4, Ex. D to Proestakes Decl.)

8

**ANSWER: Admitted.**

22.     The Health Choice SPD is the SPD that Kauffman received in July 2012.

(Kauffman's Resps. to GE's First RFAs, No. 9, filed as Exhibit 5 to Sharbaugh Decl.)

**ANSWER: Admitted.**

23.     The Health Choice SPD contains reservation of rights language on the first page:

IMPORTANT INFORMATION ABOUT THIS HANDBOOK

The General Electric Company reserves the right to terminate, amend, eliminate or replace any program, plan or benefit described in this handbook at its discretion and at any time.

(Dkt. 31-4, p. 1.)

**ANSWER: Admitted.**

24.     Unlike the July 2012 SPD, the Health Choice SPD does not contain the "expects and intends" language that is the focus of Plaintiffs' claims. It provides instead:

8.1.2 CAN THE PLANS BE CHANGED, REPLACED OR TERMINATED?

The General Electric Company reserves the right to terminate, amend, eliminate or replace the plans described in this handbook at its discretion and at any time. A decision to terminate, amend or replace a plan may be due to changes in federal law or state laws governing qualified retirement or welfare benefits, the requirements of the Internal Revenue Service, ERISA or any other reason. A plan change may include transferring all or a portion of plan assets and debts to another plan (which may be maintained by a successor employer or some other unaffiliated entity) or splitting a plan into two or more parts.

If a welfare plan is terminated, you will not receive any further benefits under the plan — other than payment of benefits for losses or expenses incurred before the plan was terminated. For plans funded through the GE Insurance Plan Trust, any assets held in the trust will be used solely to pay benefits for losses or expenses in accordance with applicable plan and trust provisions.

(Dkt. 31-4, § 8.1.2 at p. 111.)

9

**ANSWER: Admitted.**

25.     Before she turned 65 in August 2015, Kauffman did not receive any SPD for the GE Medicare Plans or any SPD that contained the "expects and intends" language. (Kauffman Dep. at 81:23-83:11, 87:25-89:9.)

**ANSWER: Admitted that Kauffman did not receive any SPD for the GE Medicare Plans or any SPD that contained the "expects and intends" language in her capacity as a participant in the GE Medicare Plans. Denied that Kauffman had never received such an SPD, however, as she received such SPDs in her capacity as a benefits counselor for GE. Kauffman Dep., PSOF Ex. D, at 74:3-75:20. Denied that the SPD Kauffman did receive in July 2012 did not incorporate such SPDs and such "expects and intends" language by reference. Health Choice SPD, Dkt. 31-4, Ex. D to Proestakes Decl., at 104, § 7.0 (referring participant to other material for information concerning "Your coverage after age 65").**

VI.     **Historical Changes to the GE Medicare Plans**

26.     GE continually evaluates the benefits it provides to its retirees, including pension and healthcare benefits. (Proestakes Dep. at 28:20.)

**ANSWER: Admitted.**

27.     As pension and healthcare costs have steadily increased over the past two decades, GE has looked for ways to control costs while striking a balance among the interests of shareholders, employees, and retirees. (Declaration of Carol S. Anderson ("Anderson Decl.") ¶ 2, filed herewith; Kauffman Dep. at 67:9-68:10; Rocheleau Dep. at 234:19-235:7.)

**ANSWER: Denied that pension and healthcare costs have steadily increased over the past two decades. PSOF ¶¶ 25 & 30; Pls. Add'l ¶ 1. Plaintiffs object to the statement concerning GE's attempts to "strike a balance among the interests of shareholders, employees, and retirees" as it is an argumentative statement of opinion that is not properly**

10

included in this statement of facts. Plaintiffs deny that GE has attempted to "strike a balance among the interests of shareholders, employees, and retirees," as GE's decisions regarding retiree benefits that are challenged by the instant lawsuit have benefited shareholders while harming employees and retirees. In support of this denial, Plaintiffs refer the Court to their contemporaneously filed memorandum, as this is a matter properly addressed through argument. Specifically, Plaintiffs note that GE's former Senior Vice President John Lynch testified that GE should reduce costs in any way that it can—a view that does not strike a balance among the interests of shareholders, employees, and retirees. *See* Lynch Dep., PSOF Ex. F, at 122:15-22. By way of example, Plaintiffs note that Evelyn Kauffman is no longer eligible for any retiree health benefits besides the Pharmacy Assistance Fund. The decision to exclude Kauffman and others from benefits did cut costs, therefore benefitting GE's shareholders, but only harmed Kauffman and other retirees.

28. Some of the cost-saving measures involved changes to plan design that shifted a greater portion of medical and prescription drug costs to retirees. (Anderson Decl. ¶ 3; Kauffman Dep. at 67:9-68:10, 73:7-11; Rocheleau Dep. at 33:14-34:5, 234:19-235:4.)

**ANSWER: Admitted that GE has engaged in such cost-saving measures. Denied to the extent this statement incorporates the argumentative statements of paragraph 27 by reference.**

29. In 2005, GE changed the eligibility requirements for the GE Medicare Plans. Employees hired after January 1, 2005 would no longer be eligible for benefits under the GE Medicare Plans. (Anderson Decl. ¶ 4.)

**ANSWER: Admitted.**

30.    In 2007, GE implemented a series of changes known as "Project Encore." Effective January 1, 2009, certain groups of salaried retirees would be required to pay incrementally larger portions of the premiums associated with the GE Medicare A Plan and GE Drug Plan. (Anderson Decl. ¶ 5; KAUFFMAN 31-34, filed as Exhibit 10 to Sharbaugh Decl.)

**ANSWER: Admitted.**

31.    In 2010, GE moved to a new, high-deductible healthcare plan for active salaried employees and pre-65 retirees – the GE Health Choice Plan. (Anderson Decl. ¶ 6; Kauffman Dep. at 16:8-17:6.)

**ANSWER: Admitted.**

32.    Effective 2011, GE contracted with a third party to administer the prescription drug plan for retirees as an Employee Group Waiver Plan, which is a Medicare Part D plan designed to provide prescription coverage to retirees in a more cost-effective manner for GE. (Anderson Decl. ¶ 7; Rocheleau Dep. at 139:24-140:2.)

**ANSWER: Admitted.**

33.    Plaintiffs do not contend that these prior changes violated the GE Medicare Plans or ERISA. (*See* Rocheleau Dep. at 234:19-235:7; Kauffman Dep. at 67:9-68:10 & Dep. Ex. 6 at p. 2 (recognizing that GE had historically adjusted benefits packages to balance increasing costs to employees and company).)

**ANSWER: Admitted that this is not one of the contentions Plaintiffs make in this suit. Plaintiffs take no position in this suit as to the legality of those changes.**

34.    Rocheleau acknowledged that he had personally negotiated changes in the healthcare plans for current employees on behalf of GE, and that those changes were extended to

former employees who were retired. (Rocheleau's Resps. to GE's First Set of Interrogs., No. 7, filed as Exhibit 6 to Sharbaugh Decl.; Rocheleau Dep. at 33:14-34:5.)

**ANSWER: Admitted.**

35. Through her work, Kauffman was familiar with past changes to GE's retiree healthcare plans. (Kauffman Dep. at 35:18-38:14, 67:9-68:10 & Dep. Ex. 7 (script for speech in which Kauffman stated "[a]ny clear thinking person knows that benefits packages are changing and that companies may, in the future, no longer provide the plans they once did.").)

**ANSWER: Admitted.**

**VII. The "Project 2015" Amendments to the GE Medicare Plans Adopted by the GE Board in September 2012**

36. Despite GE's efforts, at the end of 2011, retiree healthcare remained a significant annual expense and long-term liability for GE. (Anderson Decl. ¶ 9.)

**ANSWER: Denied. The cited material does not support this statement. In 2011, GE had over $717.2 billion in assets and $599.1 billion in liabilities. GE 2011 Annual Report, at 72,** *available at* **http://www.ge.com/ar2011/pdf/GE_AR11_EntireReport.pdf (last visited July 15, 2016). Of those $599.1 billion in liabilities, GE's "accumulated postretirement benefit obligation" or "APBO" of $10.3 billion for retiree health plans made up just 1.7% of all of its liabilities and was balanced out by just 1.4% of GE's assets.** *Id.* **at 105 (APBO chart at note (c)). In this context, $10.3 billion was not a "significant long-term liability" for GE. And that $10.3 billion represents GE's obligation for** *all* **retiree health benefits—that is, for retirees both before and after reaching age 65. Thus, GE's liability for only post-65 retiree healthcare, which is all that at issue in this case, was even less significant. In 2011 GE brought in $147.3 billion in revenues and had $127.2 billion in total costs and expenses.** *Id.* **at 70.** *Id.* **By contrast, the annual cost of GE's principal retiree benefit plans, including**

retiree life insurance and pre-65 health insurance plans not at issue here, was $1.26 billion or 1% of its total annual costs and expenses. *Id.* at 105. While the 2011 report does not break this $1.26 billion down between health and life insurance costs, in its 2010 Annual Report GE predicted that it would spend only $660 million to fund retiree health benefits—including pre-65 retiree health benefits—in 2011. GE 2010 Annual Report, at 99, *available at* http://www.ge.com/ar2010/pdf/GE_AR10.pdf (last visited July 15, 2016). In the context of the sheer magnitude of GE's annual costs, this does not represent a "significant annual expense."

37.    For example, GE's accumulated postretirement benefit obligation ("APBO") for retiree health plans was $9.5 billion at year-end 2010 and $10.3 billion at year-end 2011. (GE 2010 Annual Report, p. 100, *available at* http://www.ge.com/sites/default/files/GE_AR10.pdf (last visited June 6, 2016); GE 2011 Annual Report, at p. 105, *available at* http://www.ge.com/ar2011/pdf/GE_AR11_EntireReport.pdf (last visited June 6, 2016).)

**ANSWER: Admitted that GE's accumulated postretirement benefit obligation ("APBO") for pre-65 and post-65 retiree health plans combined was $9.5 billion at year-end 2010 and $10.3 billion at year-end 2011. Denied that these numbers exemplify "significant" long-term liabilities for GE.**

38.    In early 2012, the GE Corporate benefits team in Fairfield, Connecticut, led by Carol S. Anderson, began to develop and evaluate additional options to manage healthcare liabilities while considering benefit designs of GE's competitors and the potential impact on GE employees and retirees. The key members of the Corporate benefits team working with Ms. Anderson were Ginny Proestakes, the Director of Health Benefits, and Ken Kindl, the Manager-Finance, Corporate Healthcare. (Anderson Decl. ¶ 10; Proestakes Dep. at 28:16-30:5.)

14

**ANSWER: Denied that this process began in early 2012.** *See* **Lynch Dep., PSOF Ex. F, at 122:9-17 (discussing process that led to changes announced in September 2012, states, "We spent a year doing this.");** *see also* **Speier Dep., PSOF Ex. I, at 9:22-10:14 (explaining that Towers Watson began working on the changes announced in 2012 sometime prior to 2012). Otherwise admitted.**

39.     Ms. Anderson and her team evaluated a range of alternatives for redesigning GE's retiree medical benefits, including eliminating retiree healthcare altogether, implementing retiree reimbursement accounts, providing benefit levels to different groups of retirees based on means testing, and other options. (Anderson Decl. ¶ 11.)

**ANSWER: Admitted.**

40.     As part of its ongoing analysis, Ms. Anderson's team asked a nationally recognized consulting firm to benchmark GE's post-65 coverage against other Dow Jones 30 companies. (Anderson Decl. ¶ 19 & Ex. 3.)

**ANSWER: Admitted.**

41.     Ms. Anderson's team also engaged GE's actuarial consultant, Towers Watson, to evaluate the financial and practical implications of various changes to the retiree healthcare plans. (Dkt. 31, Proestakes Decl. ¶ 30; Dkt. 21, Declaration of David M. Speier ("Speier Decl.") ¶ 4; Proestakes Dep. at 31:24-32:11.)

**ANSWER: Admitted.**

42.     During this time, Ms. Anderson periodically apprised the Senior Vice President of Human Resources, John Lynch, of her team's activities and progress. (Anderson Decl. ¶ 12.)

**ANSWER: Admitted.**

15

43.     Mr. Lynch met regularly with the Management Development and Compensation Committee ("MDCC") of the GE Board of Directors to discuss healthcare and pension issues, including options for redesigning retiree medical plans. The MDCC is the Board committee that oversees compensation and benefit issues at GE. (Anderson Decl. ¶ 13.)

**ANSWER: Admitted.**

44.     However, only the full GE Board of Directors can amend the Plans. (Dkt. 31-1, Ex. A to Proestakes Decl. ("This Plan [GE Medicare A Plan and GE Drug Plan] may be amended, suspended, or terminated by the Board of Directors . . . ."); Dkt. 31-2, Ex. B to Proestakes Decl. ("This Plan [GE Hospital Plan] may be amended, suspended, or terminated by the Board of Directors of the Company . . . ."); Dkt. 31-3, Ex. C. to Proestakes Decl. ("This Plan [GE Medicare B Plan] may be amended, suspended, or terminated by the Board of Directors of the Company . . . ."); Rocheleau Dep. at 200:20-201:4.)

**ANSWER: Admitted.**

45.     At the MDCC meeting on February 9, 2012, Mr. Lynch helped lead a discussion of potential options that Ms. Anderson's team was evaluating, but no decisions were made. (Anderson Decl. ¶ 15 & Ex. 1; Proestakes Dep. at 39:25-40:20.)

**ANSWER: Admitted that at the MDCC meeting on February 9, 2012, Mr. Lynch helped lead a discussion of potential options that Ms. Anderson's team was evaluating. Plaintiffs object to the statement "no decisions were made" as vague. Admitted that GE did not decide to finally adopt any of those changes to the GE Medicare Plans at that meeting, as such changes could only be finally adopted by GE's Board of Directors. Otherwise denied.**

16

46.     Mr. Lynch updated the MDCC on March 15, 2012. He reported on Ms. Anderson's team's progress in identifying possible benefit design alternatives and the ongoing evaluation of these alternatives. (Anderson Decl. ¶ 16 & Ex. 2.)

**ANSWER: Admitted.**

47.     Mr. Lynch again updated the MDCC at its meetings on April 24, 2012 and June 7, 2012. At the June 7, 2012 meeting, the changes that the GE Board of Directors would eventually adopt as "Project 2015" were beginning to take shape, but remained under evaluation. (Anderson Decl. ¶ 17 & Ex. 3 and 4.)

**ANSWER: Admitted that Mr. Lynch again updated the MDCC at its meetings on April 24, 2012 and June 7, 2012. Denied that at the June 7, 2012 meeting, the changes that the GE Board of Directors would eventually adopt as "Project 2015" were only "beginning to take shape, but remained under evaluation." Admitted that GE did not decide to finally adopt any of those changes to the GE Medicare Plans at that meeting, as such changes could only be finally adopted by GE's Board of Directors. But the presentation at the June 7, 2012 meeting sets out exactly the changes that would ultimately be adopted at the September 2012 Board meeting. PSOF ¶ 26 (citing PSOF Ex. O at 5).**

48.     The minutes of the June 7, 2012 MDCC meeting reflect that the proposals under consideration were simply "preliminary recommendations" and that GE would "continue to develop and finalize its design proposal and recommended actions for review with the Committee and the Board later this year." (Anderson Decl. ¶ 18 & Ex. 4.)

**ANSWER: Admitted.**

17

49.     Between June and September 2012, Ms. Anderson's team continued to refine its understanding of the market and the impacts of potential benefit changes on GE and its employees and retirees alike. (Anderson Decl. ¶ 20.)

**ANSWER: Admitted.**

50.     Ms. Anderson's team ultimately finalized a proposal that was submitted to the GE Board of Directors on September 7, 2012. After discussion, the GE Board voted to adopt the amendment to the GE Medicare Plans referred to as "Project 2015." (Dkt. 31, Proestakes Decl. ¶ 32; Dkt. 31-6, Ex. F to Proestakes Decl.; Anderson Decl. ¶ 21 & Ex. 5.)

**ANSWER: Admitted.**

51.     The amendment eliminated future eligibility in the GE Medicare Plans for pre-65 salaried retirees and salaried employees hired prior to 2005 (and their spouses and same-sex domestic partners) who would not be retired, age 65, and enrolled in the GE Medicare Plans on or before January 1, 2015. (Dkt. 31, Proestakes Decl. ¶ 29.)

**ANSWER: Admitted.**

52.     As a post-65 retiree who was already enrolled in the GE Medicare Plans, Rocheleau was not affected by this amendment. (Rocheleau's Resps. to GE's First Interrogs., No. 1.)

**ANSWER: Admitted that Rocheleau was a post-65 retiree who was already enrolled in the GE Medicare Plans. Admitted that Rocheleau was not impacted by the changes described in paragraph 51. Denied that Rocheleau was not affected by the amendments approved by the Board at its September 7, 2012 meeting. Those amendments included an increase in Mr. Rocheleau's premiums under the GE Medicare Plans and the discontinuation of GE's reimbursement of the Income-Related Monthly Adjustment**

Amount (IRMAA). *See* September 27, 2012 Letter, PSOF Ex. G. The premium increase never took effect because it was superseded by the changes announced in 2014 that eliminated retirees such as Rocheleau from coverage by the plans. But, the termination of the IRMAA reimbursement did take effect in 2015. *See* ¶ 53 below.

## VIII. Elimination of the IRMAA Reimbursement Subsidy

53.     One component of Project 2015 as approved by the Board was the elimination of a reimbursement subsidy for a federal tax called "IRMAA" that GE had begun providing to high income retirees in 2011. IRMAA is an "income-related monthly adjustment amount" imposed on high income post-65 retirees under the Affordable Care Act to help fund the Medicare Part D Trust Fund. (Anderson Decl. ¶¶ 22-23.)[4]

**ANSWER: Admitted.**

54.     Rocheleau earns more than $1 million a year in pension benefits and other GE retirement income and is considered a high-income retiree under the Affordable Care Act. As such, he is subject to the IRMAA tax levied under the Affordable Care Act. (Rocheleau Dep. at 99:17-101:2; Rocheleau's Resps. to GE's First RFAs, No. 10.)

**ANSWER: Admitted that Rocheleau received more than $1 million in pension, retirement, deferred salary, and deferred compensation benefits from GE in 2015, the majority of which was deferred salary and deferred compensation that he earned while working for GE. Denied that Rocheleau will receive over $1 million annually throughout his retirement. Otherwise admitted.**

55.     GE's pre-2015 IRMAA reimbursement arrangement was not part of, nor required by, the GE Medicare Plans. (*See* Dkt. 31-1, Ex. A to Proestakes Decl. (GE Medicare A Plan and

---

[4] The Board also voted to increase premium contributions for certain post-65 salaried retirees who were enrolled in the GE Medicare Plans, but this change was never implemented because, as explained below, the Board voted in September 2014 to eliminate the GE Medicare Plans effective January 1, 2015.

19

GE Drug Plan); Dkt. 31-2, Ex. B to Proestakes Decl. (GE Hospital Plan); Dkt. 31-3, Ex. C to Proestakes Decl. (GE Medicare B Plan); Anderson Decl. ¶ 25.) Rather, it was a subsidy that GE had voluntarily agreed to provide to high income retirees after the federal government implemented the IRMAA tax on January 1, 2011. (Anderson Decl. ¶ 25.)

**ANSWER: Plaintiffs object that this is a conclusion of law rather than a statement of fact. Answering over their objection, Plaintiffs deny. When GE amended the Drug Plan in 2011, it promised participants that "plan benefits and…plan costs would remain the same." Anderson Decl. Ex. 6. The IRMAA reimbursement was offered by GE in order to maintain the Drug Plan benefits at the same cost, and was therefore part of the Drug Plan. *Id.* It was offered in a letter much like the letter eliminating the reimbursement in 2012, which GE describes as a "Summary of Material Modification" to the GE Medicare Plans. *Id.*; *see* ¶ 60 *infra*. As GE acknowledges by referring to the September 27, 2012 letter to retirees as a "Summary of Material Modification," such letters are sufficient to establish benefits under 29 U.S.C. § 1102. *See Williams v. Wright*, 927 F.2d 1540, 1548 (11th Cir. 1991) (a letter to employee can establish benefits governed by ERISA); *see also Leister v. Dovetail, Inc.*, 546 F.3d 875, 879 (7th Cir. 2008) (citing *Williams*). Moreover, in that September 27, 2012 letter or "Summary of Material Modification" to retirees including Dennis Rocheleau, GE explicitly described the IRMAA reimbursement as part of "GE's post-65 health benefit plans" when it described the elimination of the IRMAA reimbursement as an amendment to those plans. Letter of 9/27/2012, PSOF Ex. G.**

56.    The IRMAA reimbursement is not referenced or described in any way in the July 2012 SPD for the GE Medicare Plans. (Dkt. 31-5, Ex. E to Proestakes Decl.; Rocheleau Dep. at 141:23-142:10.)

20

**ANSWER: Admitted that there is no explicit reference to or description of the IRMAA reimbursement in the July 2012 SPD. Because the IRMAA reimbursement was part of the GE Drug Plan as set forth in GE's letters as explained in the answer to ¶ 56 above, however, the July 2012 SPD's references to the benefits of the PPDP necessarily refer to the IRMAA reimbursement as well.**

57.     On or about September 27, 2012, GE sent letters to retirees informing them that the IRMAA subsidy was being discontinued. (Anderson Decl. ¶ 26 & Ex. 8.)

**ANSWER: Admitted.**

58.     According to GE records, an average of approximately 1,700 IRMAA reimbursement subsidy payments were made each month. (Anderson Decl. ¶ 27.)

**ANSWER: Admitted.**

IX.     **Communication and Implementation of the Project 2015 Changes**

59.     The GE Board voted to implement the Project 2015 changes effective January 1, 2015. (Dkt. 31-6, Ex. F to Proestakes Decl.). Affected employees and retirees (including surviving spouses and same-sex domestic partners) were therefore given more than two years to adjust to these changes and, to the extent necessary, plan for alternatives. (Anderson Decl. ¶ 28; Deposition of John Lynch ("Lynch Dep.") at 99:22-100:5, filed as Exhibit 3 to Sharbaugh Decl.)

**ANSWER: Admitted.**

60.     In late September 2012, GE provided written notice of the changes to affected employees and retirees in a Summary of Material Modification. (Dkt. 58, Pls.' Am. Compl. ¶ 22; Dkt. 31, Proestakes Decl. ¶¶ 29, 34; Anderson Decl. ¶ 29; Rocheleau Dep. at 60:9-16 & Dep. Ex. 5.)

**ANSWER: Admitted.**

21

61.     GE also sent out informational literature about shopping for Medicare supplement plans and created a website where retirees could find comprehensive information about Medicare and Medicare supplement plans. (Anderson Decl. ¶ 30.)

**ANSWER: Admitted.**

62.     In April 2013, GE announced that retirees affected by the Project 2015 changes (including Kauffman) would have free access to a private healthcare exchange where they could purchase Medicare supplement coverage and get assistance with the transition to the private insurance market when they turned 65. GE initially retained a United Healthcare entity called myCustomHealth to provide these services; myCustomHealth was later replaced by a Towers Watson company, OneExchange. (Anderson Decl. ¶ 31; Proestakes Dep. at 85:5-19.)

**ANSWER: Admitted.**

## X.     The "Project Alpha" Amendments to the GE Medicare Plans Adopted by the GE Board in September 2014

63.     In September 2012, no other changes to the GE Medicare Plans were presented to the GE Board. (Dkt. 31-6, Ex. F to Proestakes Decl.; Anderson Decl. ¶ 32.)

**ANSWER: Denied to the extent that this statement implies that other changes had not been presented to the GE Board earlier in 2012, including the changes that were ultimately made in 2014. PSOF ¶¶ 23-25. Otherwise admitted.**

64.     Nevertheless, the GE benefits team continued to monitor industry developments and assess its approach to retiree benefits, including pension and health benefits, as it had done continuously in the past. (Anderson Decl. ¶ 33; Proestakes Dep. at 31:2-10.)

**ANSWER: Admitted.**

65.     In September 2013, one of GE's peers in the corporate marketplace, IBM, announced it was shifting all of its existing post-65 retirees from company-sponsored health

22

plans to a defined contribution structure.[5] Under this arrangement, IBM would provide those retirees with a fixed subsidy to purchase Medicare supplement plans in the private marketplace. (Anderson Decl. ¶ 34; Proestakes Dep. at 71:8-72:2.)

**ANSWER: Admitted.**

66.    The IBM announcement prompted GE to reevaluate the possibility of shifting its post-65 retiree health coverage to a defined contribution structure. (Proestakes Dep. at 72:19-73:18; Anderson Decl. ¶ 35.)

**ANSWER: Admitted.**

67.    Several considerations made the defined contribution approach attractive. First, despite the Company's efforts throughout the preceding decade, including the Project 2015 changes, GE continued to face significant retiree healthcare liabilities. (Anderson Decl. ¶ 36; Proestakes Dep. at 110:24-111:1.)

**ANSWER: Denied. For all of the reasons stated in response to ¶ 36, *supra*, GE's retiree healthcare liabilities were not significant in the context of GE's overall liabilities.**

68.    Second, GE's peers in the marketplace appeared to be moving to defined contribution healthcare models for retirees in increasing numbers, meaning that GE needed to assess its own positioning to remain competitive. (Anderson Decl. ¶ 37; Proestakes Dep. at 81:3-17, 151:18-152:3.)

**ANSWER: Plaintiffs object to this statement as vague and argumentative. The statement is vague because it is not clear who "GE's peers" are or what "marketplace" GE is referencing. The conclusion that GE "needed to assess its own positioning to remain**

---

[5] In a defined contribution arrangement (such as the one GE recently adopted), the employer provides employees or retirees with a fixed sum that they can use to purchase coverage. In a defined benefit arrangement (such as the prior GE Medicare Plans), the employer provides a specific group health plan benefit.

competitive" is both vague and argumentative. Answering over these objections, Plaintiffs deny this statement. The cited materials do not provide support for the statement. Anderson's declaration only identifies one so-called "peer" that moved to a defined contribution healthcare model—IBM. Anderson Decl. ¶ 34. There is no statement that the other Dow Jones 30 companies identified as providing defined contribution benefits recently moved to this model or whether they had ever used a defined benefit model. *Id.* 41. The cited portions of the Proestakes deposition do not identify any peers moving to defined contribution healthcare models. Nor does either citation provide support for the proposition that "GE needed to assess its own position to remain competitive." In reality, it is entirely unclear how GE gained or lost any competitive advantage over its "peers in the marketplace" by maintaining its current benefits for already-retired employees.

69. Third, private Medicare exchanges (i.e., private marketplaces where Medicare-eligible individuals can shop for and select their own Medicare supplement plans) are a robust commercial market, providing participants broader options and increased flexibility in terms of coverage and costs. Moreover, as a result of competition among insurers, the private exchanges generally offered plans with competitive premiums. (Anderson Decl. ¶ 38; Proestakes Dep. at 81:12-17.)

**ANSWER: Denied. First, it is unclear what GE is comparing Medicare exchanges to when it states that they provide participants "broader options and increased flexibility in terms of coverage and costs," and plaintiffs object to this statement as vague. Second, the statement seems to imply that these exchanges provide participants broader options and increased flexibility than they had when they were covered by the GE Medicare Plans. Plaintiffs deny this implied statement. The cited materials provide no support for this**

24

proposition. **Anderson offers no foundation for her vague opinion testimony and has not been qualified or offered as an expert. And the citation to the Proestakes deposition does not even reference private exchanges.**

**Moreover, enrollment in the GE Medicare Plans was optional and participants were always free to shop for coverage elsewhere. Proestakes Dep., PSOF Ex. BB, at 122:19-123:14. In fact, prior to the changes GE announced in 2012, GE would provide retirees a subsidy that they could use to go out and purchase coverage on the commercial market if they opted out of the GE Medicare Plans.** *Id.* **Thus, forcing them to leave the GE Medicare Plans took an option away from them rather than providing them more options.**

70.     Fourth, many plans available on the private exchanges offered all-in-one solutions that could streamline the process for choosing Medicare supplement coverage. (Anderson Decl. ¶ 39.)

**ANSWER: Admitted that such plans were available on some private exchanges. Denied to the extent this statement, when taken in the context of the previous statements, is meant to suggest that these options were not available to participants before their eligibility for the GE Medicare Plans was eliminated. The cited materials provide no support for that implied statement.**

71.     In sum, the defined contribution model afforded retirees greater choice, a wider range of coverage options, and more flexibility, while at the same time potentially decreasing costs for retirees and GE alike. (Anderson Decl. ¶ 40.)

**ANSWER: Admitted that GE reduced its own costs by shifting participants to defined contribution plans. Otherwise denied. Plaintiffs object to this statement as vague, and on the grounds that the statements made by Anderson are inappropriate opinion**

testimony that lacks foundation. Moreover, as stated above, participants in the GE Medicare Plans always had the option to leave the GE Medicare Plans in favor of options on the commercial market. In fact, for many years, GE provided participants who opted out of the Plans a stipend equal to half of plan costs to shop on the commercial market for coverage. Proestakes Dep., PSOF Ex. BB, at 122:19-123:14. Thus, eliminating eligibility in the GE Medicare Plans eliminated an option for participants rather than providing additional options. Finally, Anderson's testimony provides no support for the statement that the shift to a defined contribution model offered the potential for reduced costs for retirees.

72.     Benchmarking data showed that several of the Dow Jones 30 companies were already providing health benefits to post-65 retirees through a defined contribution arrangement. This group included IBM, Caterpillar, DuPont, and Verizon. (Anderson Decl. ¶ 41 & Ex. 9.)

**ANSWER: Admitted.**

73.     Research also showed that ten Dow Jones 30 employers no longer provided any healthcare coverage at all to post-65 retirees, including Cisco, Visa, Goldman Sachs, and Wal-Mart. (Proestakes Dep. at 77:4-78:1; Anderson Decl. ¶ 42 & Ex. 9.)

**ANSWER: Denied because the phrase "no longer" suggests that these companies provided healthcare coverage to post-65 retirees in the past and the cited materials provide no support for that proposition. Otherwise admitted.**

74.     In March 2014, the MDCC began to evaluate a high-level framework for potential design changes to the GE Medicare Plans. This framework included: (1) a private concierge service to help retirees enroll in Medicare supplement coverage; (2) a $1,000 annual credit for each eligible retiree (and the retiree's eligible spouse or same sex domestic partner); and (3) a

safety net for prescription drug coverage that would reimburse 100% of prescription drug costs incurred by the retiree in excess of a specific amount established by Medicare.[6] (Dkt. 31, Proestakes Decl. ¶¶ 38-39; Anderson Decl. ¶ 43 & Ex. 10.)

**ANSWER: Denied that the MDCC began to evaluate this framework in March 2014. All of these changes—except for perhaps the catastrophic drug coverage—were evaluated by the MDCC for all salaried retirees at least as early as February 2012. PSOF ¶¶ 23-25.**

75.     Importantly, the prescription drug assistance fund contemplated by GE would not be limited in amount. Any eligible retiree who sought reimbursement would be eligible for 100% reimbursement, in contrast with some of the prescription drug assistance funds that were being adopted by companies, which capped the available funds on an annual basis on a first-come, first-serve basis (*i.e.*, under those programs, once the money was exhausted, retirees seeking reimbursement were out of luck). (Anderson Decl. ¶ 44.)

**ANSWER: Admitted.**

76.     GE took the contemplated changes seriously and was concerned about the potential impact on retirees. In evaluating potential options, GE carefully considered how certain changes could affect retirees. Among other things, GE engaged the consulting firm of Towers Watson to model the potential financial impact on retirees, as discussed below. (Anderson Decl. ¶ 45.)

---

[6] Medicare prescription drug plans have a coverage gap (also called the "donut hole") that begins after the participant has spent a certain amount for covered drugs. Per Medicare requirements, prescription drug plans do not fully reimburse for drug costs within the donut hole. Once the participant has spent above a certain amount in out-of-pocket costs ($4,850 in 2016), catastrophic coverage provided by the prescription drug plan kicks in, but does not cover 100% of drug costs. The prescription drug assistance fund contemplated by GE – and the plan it ultimately adopted – ensures that all prescription drug costs above the catastrophic coverage threshold are covered. *See* "Costs in the coverage gap," available at https://www.medicare.gov/part-d/costs/coverage-gap/part-d-coverage-gap.html.

**ANSWER: Plaintiffs object to this statement as argumentative. Answering over their objection, Plaintiffs admit that GE considered how certain changes could affect retirees and engaged Towers Watson to model this impact. Plaintiffs deny that GE took this impact seriously as they ultimately ignored Towers Watson's counsel that GE was offering a very low defined contribution to their retirees. PSOF ¶ 49 (citing PSOF Ex. V).**

77. On July 25, 2014, CEO Jeffrey Immelt presented the Board of Directors with a framework for the proposed changes under consideration, which were part of a package referred to as "Project Alpha." (Anderson Decl. ¶ 46 & Ex. 11.)

**ANSWER: Admitted.**

78. In August 2014, two conference calls were held to brief members of the Board of Directors on the changes under review and the post-65 benefits landscape, and to respond to any questions, concerns, and directives from the Board. (Anderson Decl. ¶ 47 & Ex. 12.)

**ANSWER: Admitted.**

79. To evaluate the impact of the Project Alpha changes on retirees, Towers Watson used an actuarial model to simulate 5,000 potential health outcomes for retirees based on the medical and prescription claim patterns of 30 million Medicare-eligible retirees. Towers Watson calibrated the data to GE retirees' claims and prescription drug utilization patterns and age distribution. The same model has been used by hundreds of Towers Watson clients, including Fortune 100 companies. (Dkt. 21, Speier Decl. ¶ 12.)

**ANSWER: Admitted.**

80. The Towers Watson analysis showed that 78% percent of affected GE retirees could secure coverage suited to their specific needs at the same or lower cost than they were spending to participate in the GE Medicare Plans. And, of the 22% who were projected to incur

28

additional costs, the majority of those retirees were projected to pay less than $500 in additional costs per year. (Dkt. 21, Speier Decl. ¶ 13; Proestakes Dep. at 121:22-122:18, 124:12-15.)[7]

**ANSWER: To the extent GE seeks to offer the Towers Watson analysis as proof of the conclusions reached in the analysis, Plaintiffs object. The conclusions reached by Towers Watson are opinion, not facts, but neither David Speier nor any other expert has been offered as an opinion witness to present these conclusions. To the extent GE seeks to offer the Towers Watson analysis to prove what information GE was relying upon on when it made its decision to cut benefits, Plaintiffs respond as follows. Admitted that the Towers Watson analysis showed that 78% of affected GE retirees could have secured insurance coverage in 2014 at the same or lower cost than they were spending to participate in the GE Medicare Plans in 2014. Admitted that of the 22% who would have incurred additional costs in 2014 according to the model, the model estimated that the majority would have paid less than $500 in additional costs per year. Otherwise denied. The analysis did not consider long-term health outcomes for retirees. Speier Dep., PSOF Ex. I, at 43:23-44:11. In other words, as acknowledged in the footnote to this statement, the analysis only provided a snapshot of what retirees would have experienced in 2014 if they had been on the defined contribution plan. In the future, many of the 78% who were predicted to do the same or better would move into the 22% in years when their health was not as good. Furthermore, Plaintiffs deny the statement in the footnote that the analysis shows that "an individual may have higher costs in some years, but recoup those additional costs in other years" because Towers Watson did not analyze this possibility and there is accordingly no**

---

[7] Depending on changes in health, an individual's status within these groups could change. In some years, an individual may be among the 78% projected to save money. In other years, that individual may be among the 22% projected to incur some additional cost. Thus, as identified in the Towers Watson analysis, an individual may have higher costs in some years, but recoup those additional costs in other years.

citation to support that claim. **Not only did Towers Watson not consider changes in health from year to year, but they did not account for the fact that an individual could not predict their health from year to year and could not necessarily switch back and forth between plans on the exchange. Speier Dep., PSOF Ex. I at 49:16-55:2. In other words, Towers Watson failed to account for the purpose of insurance: to mitigate the unpredictable risk of bad health in the future. For this reason, Plaintiffs deny the statements regarding "coverage suited to [retirees'] specific needs," because Towers Watson assumed that each retiree would buy the cheapest coverage suited to their health in 2014 rather than the coverage that was best suited to protecting against the risk of changes in health. *Id.* at 66:6-69:8. In reality, a retiree cannot accurately choose a health plan suited to their specific healthcare needs in any given year because they do not know what their healthcare needs will be before the year begins, let alone in future years.**

81. Several factors made it possible for most retirees to obtain coverage appropriate to their needs at lower cost. First, the private Medicare supplement insurance market covers more than 40 million people, creating greater efficiency and price competition among insurers than the far smaller pool of retirees previously covered under the GE-sponsored plans. Second, subsidies from the federal government and pharmaceutical industry permit greater savings in the individual insurance marketplace. In addition, changes in the healthcare market more broadly have resulted in greater choice, better coverage options, and cost-savings opportunities for Medicare-eligible retirees. (Dkt. 21, Speier Decl. ¶ 14.)

**ANSWER: Denied. As stated in response to ¶ 80, the Towers Watson analysis did not show that it was possible for most retirees to obtain coverage appropriate to their needs at lower cost because it did not properly consider what coverage was "appropriate to their**

needs." Denied that the Medicare supplement insurance market provides greater efficiency than the GE Medicare Plans because the appropriate comparator pool is not the 40 million people shopping for insurance on the market. Instead, the number of people covered by the GE Medicare Plans should be compared to the pool of people insured under any one plan, which is the number that impacts the premiums for a plan. Denied that subsidies from the federal government and pharmaceutical industry permit greater savings in the individual insurance marketplace as this statement is vague and unsupported by the Speier declaration. The declaration lacks foundation and Speier is not offered as an opinion witness. Finally, denied that changes in the healthcare market more broadly have resulted in greater choice, better coverage options, and cost-savings opportunities for Medicare-eligible retirees. The statement is vague and unsupported by the Speier declaration, which lacks foundation and is inappropriate opinion testimony. Moreover, to the extent that the statement suggests that retirees had more choice once they had the option of the GE Medicare Plans eliminated, it is false, for all of the reasons set forth in response to paragraph 69 above.

82.    On September 5, 2014, the GE Board voted to amend the GE Medicare Plans to (a) eliminate coverage for post-65 salaried retirees effective January 1, 2015, and instead offer them access to coverage on a private exchange called OneExchange; (b) provide an annual $1,000-per-person Retiree Reimbursement Account ("RRA") to eligible post-65 retirees who purchase a Medicare supplement plan through the OneExchange private insurance marketplace; and (c) create the GE Pharmacy Assistance Fund ("GEPAF") under which eligible retirees are reimbursed for 100% of their out-of-pocket expenses above Medicare's catastrophic coverage

threshold for eligible prescription drug out-of-pocket costs. (Dkt. 31, Proestakes Decl. ¶¶ 38-39, 42; Dkt. 31-8, Ex. H to the Proestakes Decl.)

**ANSWER: Admitted.**

83.     From September 8 to 11, 2014, GE provided written notice of the changes to affected retirees in a Summary of Material Modification. (Anderson Decl. ¶ 49; Dkt. 8-4, Sept. 8, 2014 letter to Rocheleau.)

**ANSWER: Admitted.**

**XI.     GE's Comprehensive Rollout and Implementation Process**

84.     Following the announcement of the Project Alpha changes, GE embarked on a months-long educational campaign to assist affected individuals with the shift from the GE Medicare Plans to OneExchange. (Anderson Decl. ¶ 50.)

**ANSWER: Admitted.**

85.     GE sponsored more than 80 meetings across the country, focused in geographies with a high concentration of GE retirees, including Cincinnati, Louisville, Philadelphia, Norwalk, and Boston. (Dkt. 31, Proestakes Decl. ¶ 48; Anderson Decl. ¶ 51.)

**ANSWER: Admitted.**

86.     OneExchange assisted retirees with enrollment to ensure that they secured coverage suited to their needs by January 1, 2015. Retirees were given the option of participating in one-on-one telephone appointments with OneExchange, during which licensed benefits advisors assisted retirees with questions and made recommendations about coverage options in their area based on their needs and desires. OneExchange personnel followed up with retirees individually to make sure they enrolled in a timely manner. (Dkt. 31 Proestakes Decl. ¶ 49; Dkt. 22, Declaration of Brian Tenner ("Tenner Decl.") ¶ 4; *see also* ROCHELEAU 3443-44, filed as Exhibit 12 to Sharbaugh Decl., at 3444 (email from retiree Donald Winston, stating that "I will

32

give props here to One Exchange, and to the actual implementation of the town meetings and communication by both OE and the GE implementation team. They… have, in my opinion, done an excellent job of getting the word out, and getting 54,000 people signed up so quickly.").)

**ANSWER: Admitted.**

87.     In all, OneExchange handled 173,877 calls from GE retirees and conducted 30,287 telephone appointments (more comprehensive, pre-arranged calls with OneExchange representatives). (Anderson Decl. ¶ 52.)

**ANSWER: Admitted.**

88.     Over 55,000 individuals (or 82% of those eligible) enrolled in a Medicare supplement or prescription drug plan through OneExchange. These enrollees selected 1,443 unique plans from 100 different medical and prescription drug insurers. (Anderson Decl. ¶ 53.)

**ANSWER: Admitted.**

89.     On June 8, 2015, GE announced that it was extending the GEPAF coverage to certain retirees (such as Kauffman) who were impacted by the Project 2015 changes, retroactive to January 1, 2015. These individuals had not previously been eligible for the GEPAF. (Anderson Decl. ¶ 54.)

**ANSWER: Admitted.**

**XII.     Preparation and Distribution of the July 2012 SPD**

90.     GE's historical practice has been to issue updated SPDs every three to four years. (Zarelli Decl. ¶ 3)

**ANSWER: Admited.**

91.     A team in Schenectady, New York, drawn from GE's communications and benefits administration groups, handles the process of updating the SPDs, coordinating changes across documents, integrating changes, finalizing and proofing text, and delivering the final text

33

to the printer, which then prints and mails the SPDs to the appropriate recipients. (Zarelli Decl. ¶ 4.)

**ANSWER: Admitted.**

92.    The SPD update process generally begins with a review by the team to identify any substantive changes that have been made to the benefit plans since the previous SPD was issued. Once such changes are identified, the team prepares appropriate edits to the SPD. Upon completion, the finalized content of the SPD is "locked" and then delivered to a printing firm, which prints the SPD handbooks and mails the SPDs to the appropriate recipients. Consequently, the SPD text is generally finalized and "locked" several weeks before the SPD is mailed out to its recipients. (Zarelli Decl. ¶ 5.)

**ANSWER: Admitted.**

93.    The GE team working on the July 2012 updates to the GE SPDs (the "SPD Update Team") included Mike Fredette, who served as the communications lead for the project, and representatives of GE's benefits delivery team and legal department. The team prepared updates not only to the July 2012 SPD at issue in this litigation (RELF-12), but also SPDs for a number of other GE benefit plans for retirees and active employees. (Zarelli Decl. ¶ 6.)

**ANSWER: Admitted.**

94.    The SPD Update Team convened in the late summer or early fall of 2011 and began to assess substantive changes to the various SPDs that were to be reissued in 2012. (Zarelli Decl. ¶ 7.)

**ANSWER: Admitted.**

95.     The SPD Update Team was separate and distinct from the Corporate benefits team that in early 2012 began to evaluate potential plan design changes to the GE Medicare Plans. (Zarelli Decl. ¶ 8; Anderson Decl. ¶ 55.) *See also* paras. 38-41, *supra*.

**ANSWER: Admitted.**

96.     In April 2012, Fredette announced he was leaving GE, and Steven Zarelli became the leader of the SPD Update Team. One of Mr. Zarelli's responsibilities over the next few months was overseeing and approving the updated SPDs, including the July 2012 SPD at issue in this case. (Zarelli Decl. ¶ 9.)

**ANSWER: Admitted.**

97.     The revised content of the July 2012 SPD was finalized by the team and "locked" as of June 2012. (Zarelli Decl. ¶ 10.)

**ANSWER: Admitted.**

98.     GE gave the printer approval to print and distribute the July 2012 SPD on June 25, 2012. (Zarelli Decl. ¶ 11 & Ex. 1.)

**ANSWER: Admitted.**

99.     The July 2012 SPD was sent only to those retirees who were covered by the GE Medicare Plans at the time. (Zarelli Decl. ¶ 12.)

**ANSWER: Admitted that in July 2012 GE issued updated SPDs to retirees who were receiving benefits under the GE Medicare Plans at that time. The parties dispute who is properly considered a "participant covered under" the GE Plans pursuant to ERISA and have set forth their positions on that legal question in their briefs. As set forth in Plaintiffs' contemporaneously filed brief, they argue that Kauffman was a participant covered under the GE Plans even in 2012, prior to turning 65 years old. *See* Pls. Br. in Opposition § VI. As**

35

set forth in Defendants' paragraph 13 above, GE did not send the updated SPDs in question to Kauffman. For this reason, Plaintiffs deny this statement to the extent that it implies that GE issued updated SPDs in July 2012 to *all* retirees who were covered by the GE Medicare Plans.

100. Mr. Zarelli does not recall any discussion, prior to the issuance and distribution of the July 2012 SPD, regarding the reservation of rights language in the July 2012 SPD, Section 5.4, or the "expects and intends" language. (Zarelli Decl. ¶ 13.)

**ANSWER: Admitted.**

101. Mr. Zarelli and his team did not focus on the "expects and intends" language, or Section 5.4 more broadly, when reviewing and approving the July 2012 SPD because their focus was on identifying any benefit changes that had been adopted in the GE Medicare Plans since the previous SPDs had been issued in 2008. (Zarelli Decl. ¶ 14.)

**ANSWER: Admitted.**

102. During the time the July 2012 SPD was being reviewed, and prior to June 25, 2012 when the SPD had been finalized and sent to the printer, Mr. Zarelli was not aware of discussions taking place about potential changes to the GE Medicare Plans that would later be approved by the GE Board of Directors in September 2012. (Zarelli Decl. ¶ 15.)

**ANSWER: Admitted.**

103. Mr. Zarelli did not have any involvement in the decision to recommend or adopt changes to the GE Medicare Plans, nor was he involved in the planning process. (Zarelli Decl. ¶ 16.)

**ANSWER: Admitted.**

36

104. Sometime in mid-July 2012, Mr. Zarelli first became aware of the potential Project 2015 amendments to the GE Medicare Plans that were then being evaluated by the Corporate benefits team in Fairfield, Connecticut. He became aware because he was asked to help in drafting a communications package to affected retirees and employees, so GE would be positioned to inform participants quickly if the amendments were eventually adopted by the GE Board of Directors. (Zarelli Decl. ¶ 17.)

**ANSWER: Admitted.**

105. At the time he began assisting with the communication project, Mr. Zarelli understood that no decision had yet been made by the GE Board of Directors and that the potential amendments were still being evaluated and might not be adopted at all. (Zarelli Decl. ¶ 18.)

**ANSWER: Admitted.**

106. Although the July 2012 SPD had already been finalized and sent to the printers, Mr. Zarelli did give some thought to whether the amendments being contemplated would have any impact on the July 2012 SPD. He concluded that they did not because the potential changes were still in the evaluation stage and no decisions had been reached, and because he knew that GE was planning a prompt communication to affected retirees and employees if the Board ultimately decided to adopt these potential changes. (Zarelli Decl. ¶ 19.)

**ANSWER: Admitted.**

107. At the time the July 2012 SPD was issued, Mr. Zarelli did not know whether the GE Medicare Plans would be amended, since he knew that any amendment required the consideration and approval of the GE Board of Directors. (Zarelli Decl. ¶ 21.)

**ANSWER: Admitted.**

108.     Mr. Lynch testified that any amendment to the Plans required the consideration and approval of the GE Board of Directors. (Lynch Dep. at 140:22-141:12.)

**ANSWER: Admitted.**

109.     Mr. Zarelli did not believe that GE was in any way misleading retirees or had any intention to mislead retirees in connection with the July 2012 SPD. Mr. Zarelli's understanding was that, if the GE Board of Directors decided to amend the Plans, that decision would be promptly communicated to participants, as was in fact done. (Zarelli Decl. ¶ 22; Dkt. 31, Proestakes Decl. ¶¶ 29, 34; Rocheleau Dep. at 196:23-197:16; Kauffman Dep. at 80:2-8.)

**ANSWER: Plaintiffs object that Mr. Zarelli's beliefs are irrelevant. Answering over their objection, admitted.**

**XIII.   Evelyn Kauffman**

**A.       Kauffman's Familiarity with GE Healthcare Plans**

110.     Kauffman retired from GE on January 1, 2011. (Kauffman's Resps. to GE's Second RFAs, No. 2.)

**ANSWER: Admitted.**

111.     Prior to her retirement, Kauffman worked as a Corporate Benefits Counselor with the Business Transition Team. One of her duties was to counsel employees involved in company acquisitions or dispositions about GE benefits, including retiree benefits. (Kauffman's Resps. To GE's Second RFAs, No. 3; Kauffman Dep. at 36:25-37:7.)

**ANSWER: Admitted.**

112.     Kauffman also served as the leader of the preretirement planning seminar group. In that role, she gave presentations to employees age 50 and over who would be transitioning into retirement at some point. (Kauffman Dep. at 37:8-10; 37:18-38:12.)

**ANSWER: Admitted.**

38

113.     As a long-time member of the GE benefits group, Kauffman understands benefits issues. She read plan documents and SPDs daily in her work, and she knows that plan documents prevail over SPDs. (Kauffman Dep. at 45:22-48:2.)

**ANSWER: Admitted.**

**B.     Kauffman's Knowledge of GE's Right to Amend the GE Medicare Plans**

114.     Kauffman knew that GE had the right to amend the GE Medicare Plans. (Kauffman Dep. at 72:15-17.)

**ANSWER: Admitted.**

115.     Kauffman knew that retiree healthcare coverage was not a vested benefit. (Kauffman Dep. at 72:23-24.)

**ANSWER: Admitted.**

116.     Kauffman understood that GE could change its healthcare plans for any reason. (Kauffman Dep. at 90:10-11.)

**ANSWER: Denied. GE's citation takes Kauffman's statement in her deposition testimony out of context. In the cited exchange, Kauffman was being asked to interpret the language in Section 5.4 stating, "A decision to terminate, amend or replace a plan may be due to changes in federal law or state laws governing qualified retirement or welfare benefits, the requirements of the Internal Revenue Service, ERISA or any other reason." The full exchange reads as follows:**

> **Q. Did anyone ever tell what you that meant, "or any other reason"?**
>
> **A. No. I think I understand what "or any other reason" means.**
>
> **Q. What did it mean to you when you saw that phrase in the course of your employment?**

**A. In the course of my employment, I relied on Paragraph 1 [the paragraph containing the "expects and intends language"] and then read Paragraph 2 with the expectation that unless and until federal or state law changed, GE would maintain the plans indefinitely. It was their expectation and their intent to do that.**

**I understand they can change their plan for any reason. I just didn't see a reason why they would do that.**

**Q. But did you attach any meaning to the phrase "or any other reason"?**

**A. No.**

**Kauffman Dep., PSOF Ex. D at 89:23-90:15. It is clear from this full exchange that Kauffman did not interpret the "for any other reason" language to mean that GE could literally change the plan for any reason, but rather that she interpreted it in the context of Section 5.4 as a whole. Given the "expects and intends" language in Paragraph 1 and the list of potential reasons for changing the plan in Paragraph 2, Kauffman understood the section to mean "that unless and until federal or state law changed, GE would maintain the plans indefinitely" and that "was their expectation and their intent."**

### C. Kauffman's Lack of Harm

117. Following her retirement on January 1, 2011, Kauffman continued to be covered under the GE Health Choice Plan. (Kauffman Dep. at 15:24-16:7; Dkt. 31, Proestakes Decl. ¶ 46.)

**ANSWER: Admitted.**

118. Kauffman did not read or rely on the July 2012 SPD or any statement in any SPD. (Kauffman Dep. at 76:3-11, 81:11-83:11.) Kauffman did not read an SPD after she retired because it was "the last thing" she wanted to do. (Kauffman Dep. at 76:3-11.)

**ANSWER: Admitted that Kauffman did not read the July 2012 or any statement in any SPD after she retired. Denied that Kauffman did not "read or rely on…any statement in any SPD." The cited portions of the Kauffman deposition to not support this statement. On the contrary, the cited portions demonstrate that Kauffman did read earlier SPDs, including the very language at issue, while she was employed by GE. The cited portions say nothing about whether or not Kauffman relied on any statement in any SPD. Elsewhere, Kauffman testified specifically that she did rely on Section 5.4. Kauffman Dep., PSOF Ex. D, at 90:4-9.**

119. Kauffman was not harmed by any statement made in the July 2012 SPD. (Kauffman Dep. at 93:8-94:7.)

**ANSWER: Plaintiffs object to this statement as a legal conclusion. As it is a legal conclusion, citation to Ms. Kauffman's legal opinions is inappropriate. Answering over that objection, denied. Though Ms. Kauffman may respond in a layperson's terms, rather than with legal argument, her testimony does not support this statement. The full exchange cited by GE shows that Ms. Kauffman views her harm as the loss of "the ability to participate in the plans that [she] intended to participate in." She acknowledges that this may not have had an immediate impact on her healthcare costs in 2015, but notes, "I have no idea what's going to happen from tomorrow on." Elsewhere, Kauffman notes that the GE Medicare Plans provided her a "comfort level" that she did not have once the Plans were cancelled. Kauffman Dep., PSOF Ex D at 85:16-86:6. As Plaintiffs have argued in their brief, GE's notion of harm misunderstands the function of insurance—that is, to mitigate the risk of future harm. Kauffman may not have had exorbitant healthcare costs in 2015, but she does not know what she will incur in the future, and now she is not protected to the same degree**

41

against future harm. She was willing to pay a premium to protect against that harm, but now that opportunity has been denied her. Indeed, GE's own expert impliedly acknowledges that retirees like Kauffman have been harmed when he states that "GE could have stopped providing health care coverage for retirees altogether," but that this "would have had the effect of harming all GE retirees." Baker Report, Dkt. 77-1, at 6 (internal pagination). Since GE did stop providing Kauffman health care coverage altogether, Baker is necessarily acknowledging she was harmed.

As set forth in Plaintiffs' briefs, the misleading statements in the SPD harmed Kauffman and others by denying them the right to the loyal, honest services of a fiduciary—a right to which they are entitled under 29 U.S.C. § 1104(a)(1). *See Amara*, 131 S. Ct. at 1881 (holding that harm "might…come from the loss of a right protected by ERISA or its trust-law antecedents"). They also suffered a loss of their right to an accurate, non-deceptive SPD, especially as to the security of their benefits. *See id.* (recognizing harm caused by failure to provide proper summary information); *see also* Decision & Order of 6/5/15 (Doc. # 49) at 5 (same). Because GE made these misleading statements about their intention to continue the plans, the cancellation of the plans—in breach of that promise—is inextricably intertwined with the misrepresentations. Finally, Kauffman and others were harmed because they likely would have sought higher compensation from GE if they understood that the benefits they were being promised were not at all secure.

120.    Kauffman has no to reason to believe that GE intentionally misled her about her benefits. (Kauffman Dep. at 80:2-8.)

**ANSWER: Denied. The cited material does not support this statement. Kauffman did not testify about whether GE intentionally misled her. Instead she was asked whether**

she was intentionally misled "by anyone at GE." GE's intentions are distinct from the intentions of any individual that may have interacted with Kauffman. Moreover, Kauffman testified that she did not interact with anyone personally at GE about benefits after she retired. Kauffman Dep., PSOF Ex. D at 81:4-5. Finally, Kauffman testified only that she did not "know one way or the other" whether she was intentionally misled. *Id.* at 80:2-8. She did not say that she has no reason to believe that GE intentionally misled her, and in fact suggested that she did have some reason ("I know I made certain decisions about my life based on what I thought GE had provided me with, and that changed"). *Id.* at 80:12-14.

121.    Kauffman did not make any healthcare, financial, or other life decisions between the time the SPD was issued in July and the time she was notified of the 2012 Plan Amendment in September 2012. (Kauffman Dep. at 81:11-22.)

**ANSWER: Admitted.**

122.    Kauffman turned age 65 on August 6, 2015. She subsequently enrolled in a Medicare Advantage plan through OneExchange and pays no premium for this plan. (Kauffman Dep. at 31:6-32:1 & Dep. Exs. 3-4; Kauffman's Resps. To GE's Second RFAs, Nos. 1 & 15.)

**ANSWER: Admitted.**

123.    Kauffman found the OneExchange enrollment process helpful and not confusing. (Kauffman Dep. at 26:13-29:24.)

**ANSWER: Admitted.**

124.    Kauffman is now paying less for coverage than she would have under the GE Medicare Plans. She agrees that she "would definitely be paying more" if she had enrolled in the GE Medicare Plans. (Kauffman Dep. at 31:6-32:25; Kauffman's Resps. to GE's Second RFAs, Nos. 12-17.)

43

**ANSWER: Admitted that Kauffman is paying less for her coverage and that she would be paying more for GE Medicare Plans given her current state of health. Denied to the extent this statement implies that Kauffman will continue to pay less for her coverage than she would have paid under the GE Medicare Plans is her health changes.**

125.     Kauffman sees the same doctors and can obtain the same prescriptions under the Medicare Advantage Plans as she did under the GE Medicare Plans. (Kauffman Dep. at 33:14-35:16.)

**ANSWER: Admitted.**

126.     Kauffman cannot identify any harm she has suffered as a result of obtaining coverage through OneExchange rather than through the GE Medicare Plans. (Kauffman Dep. at 93:16-20.)

**ANSWER: Plaintiffs object to this statement as a legal conclusion. As it is a legal conclusion, citation to Ms. Kauffman's legal opinions is inappropriate. Answering over that objection, denied. Though Ms. Kauffman may respond in a layperson's terms, rather than with legal argument, her testimony does not support this statement. The full exchange cited by GE shows that Ms. Kauffman views her harm as the loss of "the ability to participate in the plans that [she] intended to participate in." She acknowledges that this may not have had an immediate impact on her healthcare costs in 2015, but notes, "I have no idea what's going to happen from tomorrow on." Elsewhere, Kauffman notes that the GE Medicare Plans provided her a "comfort level" that she did not have once the Plans were cancelled. Kauffman Dep., PSOF Ex D at 85:16-86:6. As Plaintiffs have argued in their brief, GE's notion of harm misunderstands the function of insurance—that is, to mitigate the risk of future harm. Kauffman may not have had exorbitant healthcare costs in 2015, but she does**

44

not know what she will incur in the future, and now she is not protected to the same degree against future harm. She was willing to pay a premium to protect against that harm, but now that opportunity has been denied her. Indeed, GE's own expert impliedly acknowledges that retirees like Kauffman have been harmed when he states that "GE could have stopped providing health care coverage for retirees altogether," but that this "would have had the effect of harming all GE retirees." Baker Report, Dkt. 77-1, at 6 (internal pagination). Since GE did stop providing Kauffman health care coverage altogether, Baker is necessarily acknowledging she was harmed.

127. Kauffman has not determined whether her total out-of-pocket costs have increased under her new coverage. (Kauffman's Resps. to GE's Second RFAs, No. 18.)

## XIV. Dennis Rocheleau

### A. Rocheleau's Familiarity with GE Healthcare Plans

128. Rocheleau is a Harvard Law School graduate who worked for many years as a labor negotiator on behalf of GE. (Rocheleau Dep. at 18:5-15, 33:18-34:20.) By virtue of his position with GE, Rocheleau is familiar with legal principles related to benefits. (*Id.* at 31:11-23.)

**ANSWER: Admitted.**

129. Rocheleau knew that GE previously made changes to the GE Medicare Plans. (Rocheleau Dep. at 38:5-12, 40:22-41:24, 43:6-22, 51:21-53:9 & Dep. Ex. 4 at ROCHELEAU 627.)

**ANSWER: Admitted.**

45

**B.    Rocheleau's Knowledge of GE's Right to Amend the Plans**

130.    Rocheleau knows that pension benefits are vested and that welfare benefits generally are not, and he knows that plan documents prevail over SPDs. (Rocheleau Dep. at 31:24-32:11, 192:9-17.)

**ANSWER: Admitted.**

131.    Rocheleau admitted publicly at a GE shareowner's meeting in 2013 that Section 5.4 of the July 2012 SPD gave GE the legal right to amend the GE Medicare Plans at any time and for any reason. (Rocheleau Dep. at 12:21-13:4, 15:8-16:1 & Dep. Ex. 1 at p. 18.) Rocheleau believed his statement to be true at the time he made it. (Rocheleau Dep. at 15:8-21.)

**ANSWER: Admitted that Rocheleau made the following statement at a GE shareowner's meeting in 2013:**

> The lawyer in me acknowledges that Section 5.4 of the 2012 Benefits Handbook for GE pensioner healthcare options at age 65 gives the company the right to amend the retiree health care plans for any reason.

**Rocheleau Dep., PSOF Ex. B at 15:10-18. Otherwise denied. GE has not cited to the full exchange, which includes Rocheleau's explanation that the statement was "an expression that isn't perfectly accurate, and I would like to have clarified what I was trying to say." *Id.* at 17:9-12. Rocheleau clarified his statement as follows:**

> But in answering that, it's the phrase "the lawyer in me." It meant to say I am not a practicing attorney, first of all. Secondly -- And in that technical sense or in that sense I'm not a lawyer, but I went through law school, and in that sense that's what I meant by "the lawyer in me."
>
> And secondly, I meant to convey, if not precisely, that I know how lawyers are inclined, how they are trained and how they can be creative in disputation and, therefore, could make that argument.

***Id.* at 17:18-18:4. Later in his testimony, Mr. Rocheleau testified as follows:**

46

**My belief is that the -- this is my belief --…-- that the language of 5.4 constituted a promise and a commitment on the part of General Electric, and I would have considered [the changes announced on September 27, 2012] a breach of that commitment. That's a slightly different question from the issues of legality which you have kind of illuminated me on.**

*Id.* **at 119:8-15.**

132.    Rocheleau agreed that when GE previously reduced benefits, even in the absence of financial calamity, it was not a breach or otherwise inconsistent with the language of Section 5.4 of the 2012 SPDs. (Rocheleau Dep. at 221:17-222:10, 235:5-7.)

**ANSWER: Denied to the extent this statement suggests that Rocheleau agrees that any reduction in benefits would be consistent with the language of Section 5.4. Admitted that Rocheleau agreed that specific reductions in benefits were not inconsistent.**

133.    Rocheleau acknowledged elsewhere that GE had the right to change the GE Medicare Plans. In a September 2013 email, Rocheleau wrote that "the IBM approach of continuing to extend th [sic] a subsidy, even capped, to retirees and tell them to go shop with their money and the previous company contribution/ subsidy would be a huge win…and the right thing." (ROCHELEAU 2636, filed as Exhibit 11 to Sharbaugh Decl. (ellipses in original).)

**ANSWER: Denied that Rocheleau acknowledged elsewhere that GE had the right to change the GE Medicare Plans as the statement is not supported by any citation. Admitted that Rocheleau wrote the quoted statement in a September 2013. Denied that the statement supports the first sentence in the paragraph.**

134.    In March 2015, Rocheleau wrote to another GE retiree, Jim McFarlane, that his "benefits handbook… does not in any way make an affirmative statement about your coverage being for life or being vested." (Rocheleau Dep. at 94:20-96:24 & Dep. Ex. 9.) Mr. McFarlane

47

was sent RHCA-12 in July 2012, which contains the same language in Section 5.4 as in the July 2012 SPD (RELF-12). (Zarelli Decl. ¶ 23.)

**ANSWER: Admitted.**

**C.     Rocheleau's Lack of Harm**

135.    After he turned 65 in February 2007, Rocheleau was covered under the Medicare A Plan, the Hospital Plan, the Drug Plan, the Elfun Plan. (Rocheleau Dep. at 120:8-24; Rocheleau's Resps. to GE's First RFAs, No. 4.)

**ANSWER Admitted.**

136.    Rocheleau recalls receiving an SPD in 2012, but he cannot recall any specific provision he read upon receipt. (Rocheleau Dep. at 29:5-30:16.)

**ANSWER: Admitted.**

137.    Rocheleau did not rely on the SPD he received in 2012, nor on any statement in any SPD. (Rocheleau Dep. at 114:5-13, 116:21-117:13, 118:13-24).

**ANSWER: Admitted that Rocheleau did not directly rely on any specific statement in any SPD. Denied that Rocheleau did not indirectly rely on any of the promises GE made in those SPDs, as he testified that he relied on others who knew more about the GE Medicare Plans, including his friend Chuck Welch, to help him make his retirement plans. Rocheleau Dep., PSOF Ex. B, at 116:21-117:9; *see CIGNA Corp. v. Amara*, 131 S. Ct. 1866, 1881 (noting that "it is not difficult to imagine how the failure to provide proper summary information, in violation of the statute, injured employees even if they did not themselves act in reliance on summary documents--which they might not themselves have seen--for they may have thought fellow employees, or informal workplace discussion, would have let them know if, say, plan changes would likely prove harmful").**

48

138.     Rocheleau has no specific information that GE put the "expects and intends" language in the July 2012 SPD for the purpose of misleading retirees. (Rocheleau Dep. 196:23-197:16.)

**ANSWER: Denied. The cited materials do not support the statement. GE cites to Mr. Rocheleau's answer to an incomplete question. Mr. Rocheleau's final answer to the complete question reads as follows:**

> **My attitude, my belief, my opinion is that that language is in the Summary Plan Description to comfort and assure people, and it is misleading because the company takes the position that despite that language, they can change these plans.**

**Rocheleau Dep., PSOF Ex. B, at 198:1-6.**

139.     Rocheleau did not retire to lock in benefits, and he did not do anything to try to figure out retirement or medical benefits before retiring. (Rocheleau Dep. at 114:5-13, 116:21-117:13, 246:18-20.)

**ANSWER: Admitted that Rocheleau did not retire to lock in benefits. Denied that that Rocheleau did not do anything to figure out retirement or medical benefits before retiring. Rocheleau testified that he relied on others who knew more about the GE Medicare Plans, including his friend Chuck Welch, to help him make his retirement plans. Rocheleau Dep., PSOF Ex. B, at 116:21-117:9.**

140.     Between the time the SPD was issued in July 2012 and the time he was notified of the 2012 amendment in September 2012, Rocheleau did not make any healthcare, financial, or other life decisions based on the SPD. (Rocheleau Dep. at 118:13-24.)

**ANSWER: Admitted.**

141.     Rocheleau suffered no harm as a result of any statements made in the SPD he received in 2012. (Rocheleau Dep. at 159:9-160:19.)

49

ANSWER: Plaintiffs object to this statement as a legal conclusion. As it is a legal conclusion, citation to Rocheleau's legal opinions is inappropriate. Answering over that objection, denied. Though Rocheleau may have phrased his response in a layperson's terms, rather than with legal argument, his testimony does not support this statement. Rocheleau repeatedly testified that he was harmed because the SPD contained a misleading statement, as all SPDs had in the past. Rocheleau Dep. at 159:21-160:11. He only said there was no harm after the question was repeated multiple times, and in one iteration with the qualifier, "Other than the belief the statement was misleading…" Rocheleau Dep. at 159:25-160:1. Moreover, counsel's questions are argumentative, as they attempt to distinguish between the harm inflicted by the cancellation of the plan and the harm inflicted by the misleading statements, when in fact these two acts are linked. These are legal questions properly resolved by the briefs. As set forth in Plaintiffs' briefs, these misleading statements harmed Rocheleau and others by denying them the right to the loyal, honest services of a fiduciary—a right to which they are entitled under 29 U.S.C. § 1104(a)(1). *See Amara*, 131 S. Ct. at 1881 (holding that harm "might…come from the loss of a right protected by ERISA or its trust-law antecedents"). They also suffered a loss of their right to an accurate, non-deceptive SPD, especially as to the security of their benefits. *See id.* (recognizing harm caused by failure to provide proper summary information); *see also* Decision & Order of 6/5/15 (Doc. # 49) at 5 (same). Because GE made these misleading statements about their intention to continue the plans, the cancellation of the plans—in breach of that promise—is inextricably intertwined with the misrepresentations. Finally, Rocheleau and others were harmed because they likely would have sought higher

50

**compensation from GE if they understood that the benefits they were being promised were not at all secure.**

142.     In December 2014, Rocheleau enrolled through OneExchange in the AARP Medicare Supplement Plan from United Healthcare and the SilverScript Choice prescription drug plan (the "New Plans"). This coverage became effective January 1, 2015. (Rocheleau's Resps. to GE's First RFAs, No. 7.)

**ANSWER: Admitted.**

143.     In 2014, Rocheleau paid $151.50 per month in premiums for coverage under the Medicare A Plan, the Hospital Plan, the Drug Plan, and Elfun Plan. (Dkt. 21, Speier Decl. ¶ 16.)

**ANSWER: Admitted.**

144.     Rocheleau now pays about $180 per month ($2,162 per year) in premiums for coverage under the New Plans. (Rocheleau Dep. at 130:22-132:23.) But he also receives the annual $1,000 RRA, which reduces his annual premium costs to $1,162 per year or $97 per month. (Rocheleau Dep. at 132:5-11; Rocheleau's Resps. to GE's First RFAs, No. 9.)

**ANSWER: Admitted that these are Rocheleau's premium payments for the New Plans. Denied that this fully accounts for Rocheleau's costs under the New Plans, as he is now also responsible for the IRMAA in order to qualify for Medicare Part D and he no longer receives reimbursement from GE. *See* DSOF ¶¶ 53-54. Rocheleau pays roughly $800 a year for the IRMAA, and also suffers the tax consequences of paying that $800, which he previously avoided when GE provided the reimbursement as a pre-tax benefit. Rocheleau Dep., PSOF Ex. B at 133:7-22. Factoring in the IRMAA, Rocheleau pays more for coverage than he did under the GE Medicare Plans.**

145. Rocheleau agrees that he pays less in premiums now than he did under GE Medicare Plans. (Rocheleau Dep. at 142:11-143:4.)

**ANSWER: Admitted that Rocheleau pays less in premium payments alone for the New Plans. Denied that this fully accounts for Rocheleau's costs under the New Plans, as he is now also responsible for the IRMAA in order to qualify for Medicare Part D and he no longer receives reimbursement from GE.** *See* **DSOF ¶¶ 53-54. Rocheleau pays roughly $800 a year for the IRMAA, and also suffers the tax consequences of paying that $800, which he previously avoided when GE provided the reimbursement as a pre-tax benefit. Rocheleau Dep., PSOF Ex. B at 133:7-22. Factoring in the IRMAA, Rocheleau pays more for coverage than he did under the GE Medicare Plans.**

146. Rocheleau has not determined whether his total out-of-pocket costs have increased under the New Plans. (Rocheleau's Resps. to GE's First RFAs, No. 8.)

**ANSWER: Admitted.**

147. Other than an alleged cost increase in connection with GE's elimination of the IRMAA reimbursement (which was not part of the GE Medicare Plans), Rocheleau cannot identify any other harm he has suffered. (Rocheleau Dep. at 40:22-42:5, 158:3-13.)

**ANSWER: Denied. It is undisputed that Rocheleau has suffered an in increase in cost in connection with GE's elimination of the IRMAA reimbursement. Rocheleau Dep., PSOF Ex. B at 133:7-22. Denied that the IRMAA reimbursement was not part of the GE Medicare Plans.** *See* **Resp. to ¶ 55** *supra***. Rocheleau also identified higher out-of-pocket costs that he pays on a number of prescriptions under the New Plans when compared with the GE Medicare Plans. Rocheleau Dep., PSOF Ex. B, at 151:18-154:5.. Finally, as argued**

throughout Plaintiffs' briefs, Rocheleau has lost the protection against changes in health that the defined benefit offered by GE provided him.**

148.    With the New Plans, Rocheleau is able to afford his prescription drug costs; he sees the same doctors, and he has been able to secure all medical procedures. (Rocheleau Dep. at 143:18-144:18, 157:11-19.) He cannot identify any way in which his coverage under the New Plans is lacking. (Rocheleau Dep. at 157:20-22.)

**ANSWER: Denied that Rocheleau cannot identify any way in which his coverage under the New Plans is lacking. For instance, he is paying far more for some of his prescriptions than he was under the GE Medicare Plans. He has had trouble with customer service and errors in coverage under the New Plans. Rocheleau Dep., PSOF Ex. B, at 151:18-154:5. Otherwise admitted.**

149.    Rocheleau enjoys substantial retirement income. In 2015, Rocheleau received $1,024,946.54 in pension, retirement, deferred salary, and deferred compensation benefits from GE. (Rocheleau's Resps. to GE's First RFAs, No. 10; Rocheleau Dep. at 99:17-101:2.)

**ANSWER: Admitted.**

### Civil Local Rule 56(b)(2)(B)(ii) Statement of Additional Facts Requiring Denial of Summary Judgment

Plaintiffs offer the following additional undisputed facts requiring denial of Defendant's motion for summary judgment. Because this case is the subject of cross-motions for summary judgment, Plaintiffs rely on a number of the statements of fact that they offered in support of their own motion for summary judgment. Dkt. 81. Plaintiffs cite to their original statement of facts throughout their brief as "PSOF," and to the additional facts here as "Pl. Add'l." The only

53

exhibit Plaintiffs offer in support of these additional facts is labeled consecutively to the exhibits offered in support of the PSOF as Exhibit II.

1.      GE's costs for Retiree Health and Life Insurance fell from $1.6 billion in 2009, to $1.4 billion in 2010, to $1.3 billion in 2011, to $1.2 billion in 2012.  GE social costs slide, attached hereto as Exhibit II.

2.      John Lynch worked under the belief that GE should cut any cost that it can, including during the year spent planning for the changes to retiree health benefits that took place in 2012.  (PSOF Ex. F, Lynch Dep. at 122:15-22.)

3.      GE spent a year planning and implementing the changes to retiree health benefits that took place in 2012.  (PSOF Ex. F, Lynch Dep. at 122:9-17).

4.      Before switching to a defined contribution model, GE already offered participants the chance to go on to the commercial market with a direct subsidy. However, the majority of participants declined that option. (PSOF Ex. BB, Proestakes Dep. at 122:19-123:14)

5.      The table of contents of the SPD makes no reference to a reservation of rights. Page 5 (internally paginated) in the table of contents of the SPD directs readers to Section 5.4 on page 58, under the heading "Can the plans be changed, replaced or terminated?" (July 2012 SPD, Dkt. 31-5, p.8.)

6.      The December 10, 2007 letter explaining changes to the GE Medicare Plans explains the reasoning for the changes as follows:

> …GE remains committed to the people, current and retired, who have devoted years to making us a global leader. Although the health benefits of future GE retirees will be somewhat different than today, they will continue to be among the best available from any company.

(Dkt. 75-10, Ex. 10 to Sharbaugh Decl., at 1.)

54

7.      Kauffman  received the letter attached to PSOF as Exhibit G. (Kauffman Dep., PSOF Ex. D, at 92:22-93:3). It states in relevant part as follows:

> Dear GE Benefits Participant,
>
> Effective January 1, 2015, GE's post 65 health benefit plans will be amended  as outlined in this letter.
>
> * * *
>
> The Company is taking this action to remain competitive now and into the future, as fewer companies offer such coverage and the cost of health care continues to be a challenge the Company must address.
>
> You will receive updates to *Your Benefits Handbook* providing further details on these amendments.

PSOF Ex. G.

8.      In 2011 GE brought in $147.3 billion in revenues and had $127.2 billion in total costs and expenses. GE 2011 Annual Report, at 70, *available at* http://www.ge.com/ar2011/pdf/GE_AR11_EntireReport.pdf (last visited July 15, 2016).

9.      The annual cost of GE's principal retiree benefit plans, including retiree life insurance and pre-65 health insurance plans not at issue here, was $1.26 billion or 1% of its total annual costs and expenses. *Id.* at 105. While the 2011 report does not break this $1.26 billion down between health and life insurance costs, in its 2010 Annual Report GE predicted that it would spend only $660 million to fund retiree health benefits—including pre-65 retiree health benefits—in 2011. GE 2010 Annual Report, at 99, *available at* http://www.ge.com/ar2010/pdf/GE_AR10.pdf (last visited July 15, 2016).

Dated: July 18, 2016                                    Respectfully submitted,

                                                        s/ Sean Morales-Doyle
                                                        One of Plaintiffs' Attorneys

Thomas H. Geoghegan
Michael P. Persoon
Sean Morales-Doyle
Carol T. Nguyen
Despres, Schwartz & Geoghegan, Ltd.
77 West Washington Street, Suite 711
Chicago, Illinois 60602
(312) 372-2511