**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION**

| | | |
|---|---|---|
| Evelyn Kauffman and Dennis Rocheleau, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 14-cv-1358 |
| | ) | |
| v. | ) | The Honorable Lynn Adelman |
| | ) | |
| General Electric Co., | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF
THEIR MOTION FOR SUMMARY JUDGMENT**


Dated: August 8, 2016                                Respectfully submitted,

                                                         s/ Sean Morales-Doyle
                                                    One of Plaintiffs' Attorneys

Thomas H. Geoghegan
Michael P. Persoon
Sean Morales-Doyle
Carol T. Nguyen
Despres, Schwartz & Geoghegan, Ltd.
77 West Washington Street, Suite 711
Chicago, Illinois 60602
(312) 372-2511

# INTRODUCTION

Plaintiffs are entitled to summary judgment because the statements made by GE in Section 5.4 of the Plans were either deceptive or made with such a disdain for their accuracy that the GE officers and directors did not consider them or even know they had been made. Either deception or a complete breakdown of fiduciary oversight justify the use of equitable remedies like reformation and surcharge. *Kenseth v. Dean Health Plans,* 610 F.3d 452 (7th Cir. 2010) and 722 F.3d 869 (7th Cir. 2013) (hereafter "*Kenseth I*" and "*Kenseth II*"). Section 5.4 should be made part of the Plans. Under these particular circumstances, GE's abrupt termination of the Plans without any cause would violate the promises in the Plans as reformed.

# ARGUMENT

## I.    GE's deception or malfeasance in continuing the false assurances of Section 5.4 lasted for years.

In drafting and reissuing Section 5.4, GE's breach of fiduciary duty—whether described as fraud or a lack of honest fiduciary administration—extended for years. In opposing the motion for summary judgment GE tries to depict the fraud as just running in the few weeks from the re-issuance of Section 5.4 in July 2012 to the Board's action of September 7, 2012. And even at this time GE argues that it was making no real change in amending the Plans to terminate Kauffman's coverage entirely and raising Rocheleau's premiums from zero to fifty percent of Plan costs. Of course it was a breach of Section 5.4, which promises to keep the Plans "described in the Handbook" in place and not even "amend" them in any serious way except for reasons similar to "changes in the law." But even *after* this breach, GE kept the same section 5.4 in place, without change. The same SPD with the same Section 5.4 continued to say GE "intends" to continue the Plans "indefinitely." It is hard to see why that statement is not an outright lie. In 2013, Jeffrey Immelt, who is both the CEO and a member of the Board of Directors, had told his

1

subordinates like Proestakes to pick up or continue the work preliminarily approved by the Board in February 2012 to cancel the Plans entirely and move the participants to exchanges.

Though GE would like to limit the deception to a few weeks—and say the changes in September 2012 did not amount to much—the fraud or dishonesty in this case began at least a year prior to the actions adopted by the Board in September 7, 2012. It is Mr. Lynch who testified that GE was working on the actions for the previous year. Then after September 2012—while GE continued the same Section 5.4 in effect—GE followed through on the complete termination of the Plans to which the Board had given a preliminary approval in February 2012.

In the narrowest sense then, Section 5.4 was a fraud upon participants from September 2011 through September 2014. In a broader sense, Section 5.4 had been a fraud from its inception. Plaintiffs base that claim on the undisputed fact that GE has been arguing in this case that Section 5.4 is illusory and the promised limits on termination mean nothing at all. To be sure, participants understood that GE could terminate the plans. Section 5.4 did use the so-called "ROR" language. Nor do plaintiffs claim that the benefits are vested. To the contrary, plaintiffs agree that Section 5.4 allows for termination of the Plans. But just as the ROR is contractual in nature, the assurances or limitations on that power are contractual too. Plaintiffs in their depositions gave not lawyer-like but common sense interpretations of this promissory language: yes, they understood that GE could terminate, but it had to be for a serious reason. GE may scoff that Section 5.4 does not put it in that way literally, but plaintiffs are not speaking as lawyers. From a *legal* or *lawyer's* point of view, GE has limited itself even more than in the sense given by participants. From a *legal* point of view, GE has committed itself in Section 5.4 to a best efforts clause similar to the kind of clause enforced in *Bloor v. Falstaff*, 601 F.2d 609 (2nd Cir. 1979) (Friendly, J.), or *Olympia Hotels Corp. v. Johnson Wax Dev. Corp.*, 908 F.2d 1363, 1373

Case 2:14-cv-01358-LA   Filed 08/08/16   Page 3 of 16   Document 94

(7th Cir. 1990). In addition, based on the principle of *ejusdem generis*, GE has committed itself to terminate the plan only for reasons that are similar to changes of law.

Yet GE comes before this Court to say that it intended nothing by this contractual language—which of course, as GE knew but plaintiffs did not, is not a part of the Plans. In this broader sense, the deception continued throughout most or all of the participants' working lives when like Kauffman they earned their eligibility to be participants.

Under 29 U.S.C. §§ 1022 and 1024 GE had an obligation to "reasonably apprise...participants of their rights *under the plan*." This SPD sets out rights not in the Plan, and that GE did not take seriously—or even have knowledge of, apparently, as Lynch and Board members never even saw the SPD. Under 29 U.S.C. § 1024, GE is supposed to apprise participants of "the circumstances which may result in...loss of benefits." GE told participants, falsely, that it would terminate *or amend* the Plan only for "changes in law" and "any" reason, which should be presumed to be any reason like this. Certainly this statement was either false or careless or both. *Kenseth I* makes actionable not just deception but a failure of fiduciary oversight, a breach not just of the duty of loyalty but the duty of care. 610 F.3d at 469-72. The very best case that GE could possibly make on this set of undisputed facts is that GE managers paid no attention or regard to what the SPD was telling participants and that GE had been careless or reckless in its statements not just on one limited occasion but for years leading up to the cancellation of the Plans entirely in September 2014.

In particular the statement that GE "intends" to continue the Plans in effect "indefinitely" cannot be interpreted as a moment-to-moment intent. It is a best efforts clause—a promise enforceable for a reasonable period of time, renewed every day for a reasonable period so long as the SPD goes unchanged, to make an effort to keep the Plans in place. To be sure, GE can

3

withdraw that promise at any time, but it cannot cancel the promise already made to make a *reasonable* effort—or keep up its current effort—to continue the Plans for a reasonable period. Courts routinely imply such a term of duration when the contract is silent on the matter. 1 Williston, § 4.19, at 446-47; 5 Corbin on Contracts § 24.29. It is equally reasonable to do so when the contract states that duration is "indefinite."

To rebut the deception—if not the systematic lack of oversight—GE has continually alleged a "fact" that it does not dare try to put in evidence. GE continues to say the Board did intend to continue the Plans "indefinitely" up until the moment on September 7, 2012 that the Board adopted the first set of changes. And GE appears to contend that the Board did "intend" to continue the Plans "indefinitely" until the Board terminated them in September 2014. But while offering this fact over and over, GE has not put in any affidavit or declaration under penalty of perjury from any member of the Board or from anyone present at the Board meetings. Most recently it has put in the Declaration of Ms. Proestakes as to what she heard. Where plaintiffs have presented evidence of fraud, GE has some burden to rebut that evidence and not just assert a denial that it refuses to support by the declaration of a person or witness competent to give firsthand testimony.

Furthermore, it is unacceptable slicing and dicing to say that GE's "intent" is only the intent revealed by a formal resolution of the Board. The Chief Executive Officer of GE and the Senior Vice President of Human Relations have agency authority to manage, administer, and chart the future of GE's benefit plans. It is absurd to say that the GE CEO and top officers intend the changes, but GE itself as a corporate entity does not intend them. The top officers of GE *are* GE, especially where the Board had full knowledge of what the officers were doing. Long before the July 2012 SPD appeared, the Board in February 2012 did intend to make changes that did

4

violate Section 5.4—and these changes as outlined below *were* adopted in September 2012. So as early as February 2012, and with the preliminary approval of the Board, GE had an intent *not* to continue the Plans as described in the Handbook.

At least in September 2012, the top officers—not the Board itself, but the officers—held back on terminating the Plans for all 60,000 participants currently receiving benefits. Even so, the Board actions still breached Section 5.4. First, GE eliminated the coverage of Evelyn Kauffman and thousands of other participants, who were eligible for payment upon turning 65. While GE may deny they are participants, that happens to be the law of the case. Decision & Order of 6/5/2015, Dkt. 49, at 5-6. Furthermore, under ERISA Section 1002(7), and Department of Labor regulations, it is the law of the land. See 29 C.F.R. §§ 2520.104b-2 & 2510.3-3(d)(1)(i)(B). GE may protest that it did not "deceive" Kauffman and other participants as to its intent because it did not send them an SPD. But under 29 C.F.R. 2520.104b-2, they were supposed to receive an SPD, even if they were not yet receiving benefits. Furthermore, in *CIGNA Corp. v. Amara,* 131 S. Ct. 1886,1881 (2011), the Supreme Court made clear that participants like Kauffman need not know or rely upon the deceptive statement, though of course Kauffman actually worked with these SPDs in counseling GE employees who took retirement. So GE terminated thousands of participants. According to Professor Baker, GE's expert, there are just under 10,000 participants or persons like Kauffman who were eligible but not yet retired and over 65. Furthermore, since it appears that Professor Baker was not counting spouses, the number affected could be significantly higher.

In addition on September 7, 2012, GE also required participants like Rocheleau to pay no longer zero but 50 percent of Plan costs. Plaintiffs do not have an exact number of these participants but the number runs into the thousands. Section 5.4 is a promise not just to

"terminate" but to "amend" only in specific situations and while it is not reasonable to interpret Section 5.4 as prohibiting minor amendments, an increase like that imposed on Rocheleau was a major change in the Plans and a breach of Section 5.4. Of course these costs were not in fact imposed because in September 2014 GE eliminated their coverage as well—but a breach of Section 5.4 cannot be excused by an even bigger breach of Section 5.4. Long before the July 2012 SPD the GE Board and officers did intend to take actions that changed the Plans radically within the coming months.

## II.     GE's partial termination of the Plans in September 2012 and complete termination in September 2014 inflicted harm on participants.

Plaintiffs have addressed this argument in their Memorandum in Opposition to GE's Motion for Summary Judgment. For GE to deny Article III injury—to deny the participants suffered an "actual," or "concrete" injury—seems ridiculous. The participants lost their health insurance. GE's response seems to be: "Oh, they can go buy other health insurance." Or: "If they get less coverage, it won't matter, because maybe they won't get sick." *Every participant* is now at a risk that the participant would not have otherwise had. Even if the participant does not end up paying higher costs—and GE does not dispute that even many "smart shoppers" will be hurt—every participant faces a new and greater economic uncertainty. As GE acknowledges, the 22 percent whom David Speier said will pay more in a given year could be a different 22 percent every year. Even if that is not true, 100 percent of the participants are now at risk of being in that 22 percent.

Furthermore, they suffered an injury in that they lost a protected legal status and specific rights as "participants" in the Medicare Plans. They also lost a right to GE's services—to the benefit of GE's career-long promise that GE would manage their medical affairs upon retirement. For some, this is a serious loss. Some participants are impaired—or will be in the

6

years ahead—and now have a burden of managing their affairs, or to quote David Speier, of being "smart shoppers," that they are not capable of performing and had no desire to have.

The argument boils down to the following: there is no Article III standing because it is hard to say as of the time of the filing of this case how badly each participant will be hurt. In GE's view, there is never standing to complain about the loss of health insurance. That argument defies the whole point or logic of health insurance—to insure against a future risk. To be sure, participants can go out on the exchanges and buy other insurance, with less coverage or at a higher premium. But GE is talking about mitigation of an injury, and for most if not all participants, a partial one, at least in coverage or in premium. Even if it were otherwise, the fact that plaintiffs can mitigate an injury *after* it occurs can hardly be grounds under *Spokeo* or any other case to deny standing here.

But even if the participants did not suffer an actual out-of-pocket loss, they could still sue GE for unjust enrichment. As set out in *Kenseth II,* participants may sue to *either* recover economic loss *or* prevent unjust enrichment. 722 F.3d at 878. Indeed, since *CIGNA v. Amara, supra,* every Circuit addressing the issue has agreed. *See, e.g., McCravy v. Metro. Life Ins. Co.*, 690 F.3d 176, 181 (4th Cir. 2012). Even without an economic loss, they have standing to sue provided there is (1) fraud, and (2) unjust enrichment. Here of course there is fraud—or a complete lack of oversight. And the amount of unjust enrichment from the changes in September 2012 and then again in September 2014 is colossal. GE itself reported that the two Board actions together saved GE $1.2 billion, which is hardly spare change. That figure comes from GE's own 10-K report. So while plaintiffs did suffer economic injury, they need not do so to obtain the equitable remedies of reformation and surcharge. *Merrimon v. Unum Life Ins. Co of Am* , 758

F.3d 46 (1st Cir. 2014). The Third Circuit in *National Security Systems v. Iola*, summed up the law as follows:

> Appropriate equitable relief under § 502(a)(3), the Supreme Court instructs, refers to those categories of relief that were *typically* available in equity.
>
> * * *
>
> The Restatement of Restitution provides, "where a fiduciary in violation of his duty to the beneficiary receives or retains a bonus or commission or other profit, he holds what he receives upon a constructive trust for the beneficiary." Restatement of Restitution § 197, at 808 (1937). This rule applies even when the fiduciary's disloyal enrichment causes the beneficiary no harm. *Id.* § 197, at 809-10, cmt. c. "The rule . . . is not based on harm done to the beneficiary in the particular case, but rests upon a broad principle of preventing a conflict of opposing interests in the minds of fiduciaries, whose duty it is to act solely for the benefit of their beneficiaries." *Id.*

700 F.3d. 65, 100-01 (3rd Cir. 2012) (emphasis in original, some internal marks and citations omitted).

GE cites *Skinner v. Northrop Grumman Plan B*, 673 F.3d 1162 (9th Cir. 2012), but that case does not depart from a unanimous Circuit view. To be sure, the Ninth Circuit said in *Skinner* that not every inaccuracy in an SPD is actionable, but noted that in the case at hand there was (1) no fraud, and (2) no unjust enrichment. The same is true in *Gabriel v. Alaska Elec. Pension Fund*, 773 F.3d 945 (9th Cir. 2014).

## III.    Whether seen as deception or a total breakdown of fiduciary oversight, GE's disregard of the assurances it made in Section 5.4 in itself caused harm to plaintiffs.

Here too plaintiffs addressed the injury from the deception or breach of care in the Opposition to GE's Motion for Summary Judgment. This is a case of a fiduciary breach—arising from a deception in violation of the duty of loyalty under ERISA Section 1104(a)(1) or a complete lack of oversight in violation of the duty of care under ERISA Section 1104(a)(2). Both

8

kinds of fiduciary violations are actionable under *Kenseth,* and will justify reformation and surcharge. In *Amara*, the Supreme Court noted with apparent approval that the district court below had found a *presumption* of injury from a fiduciary breach, and placed the burden on defendant to rebut it. 563 U.S. 421, 432-33 (2010). GE simply has not rebutted the presumption that a breach of Section 5.4 caused injury to participants—and it is impossible to do so, since GE terminated the plans, in effect admitted injury to those like Kauffman, and admitted that some large number of participants will be injured in the future. Furthermore, aside from this economic injury, the Supreme Court in *Amara* noted that participants could suffer injury just from the loss of an ERISA right. Simply from the breach of Section 5.4, plaintiffs suffered an injury or loss of a right to honest fiduciary behavior or competent fiduciary oversight.

Plaintiffs have already discussed the deception—but it is worth emphasizing the lack or breakdown of fiduciary oversight. In particular, the Board members took the actions of September 2012 described above without even knowing Section 5.4 existed. GE's last brief tries to insinuate that Lynch really did know what was in Section 5.4. He did not. He testified rather that he assumed there was a reservation of rights clause. But he did not read Section 5.4, and then he testified that even if he had, he would not have told or given it to the Board! Since no one at the top of GE knew of its existence, there was no legal opinion about it either. Only after the fact, in this litigation, have GE's lawyers come into the picture.

GE now asks the Court to assume that if Board members had known about Section 5.4 and with the benefit of a legal opinion, the Board members would have cancelled the Plans just as they did. There is no such evidence in the record. Let us suppose an in-house legal opinion reflected this Court's own opinion of June 9, 2015. The Board might have acted in accordance with that opinion. The Board might have decided the Plans would remain in place. Of course no

9

one knows because the Board did not have knowledge that Section 5.4 even existed. On this motion for summary judgment, GE can hardly deny (1) that the Board should have known about Section 5.4, and (2) the Board should not have taken any action in light of that Section. With so much at stake, plaintiffs were entitled to have GE or the Board at least *know* what GE had promised, and to have at least this much competent oversight before a decision like this is made.

On the other hand, let us assume that GE intended a deception. There are multiple ways in which the deception itself—as distinct from the ensuing loss of benefits—injured plaintiffs. First, the deception that mattered was the false representation that Section 5.4 was part of the Plans. For the SPD is supposed to be a statement to participants as to their rights under the Plans, and plaintiffs had a right to assume and believe that the Plans placed the same limitation on the power to terminate as Section 5.4 set out. But for that deception, the Plans would still be in place, because plaintiffs could have sued directly for breach of limitations that were not just in an SPD but in the Plans. In other words, GE could not have gone ahead with the terminations if the SPD had complied with Sections 1022 and 1024 of ERISA.

And here is the distinction with *In re Unisys.* In that case the district court found that despite language in the SPD about the employer's "intent," the benefits were still *not* vested. Since the employees in that case—unlike plaintiffs—were arguing that the benefits *were* vested, reforming the Plans to include "intent" would not have changed the legal outcome. But as noted frequently in this case, plaintiffs are making a different claim, different from the one made *In re Unisys.* In this case, plaintiffs are just arguing that there is a best effort clause. And the deception in this case does cause injury. If there had been compliance with Sections 1022 and 1024 of ERISA, and if Section 5.4 or the equivalent had been in the Plans, plaintiffs could have directly sued for a declaration of their rights under the plan pursuant to Section 1132(a) of ERISA. It

would not create vested benefits but would have placed some enforceable contractual limitations on when a "loss of benefits" could result within the meaning of 29 U.S.C. § 1024.

So while in the case of *In re Unisys,* the deception made no difference, here it does. Even though GE has a power to terminate, Section 5.4 creates objectively enforceable contract rights. By representing Section 5.4 as part of the plan when it was not—in a knowing and not accidental misleading of participants in violation of ERISA Sections 1022 and 1024 of ERISA—the deception deprived plaintiffs of enforceable contractual rights.

Furthermore, as plaintiffs previously argued, GE furnished Section 5.4 as consideration for the service that plaintiffs rendered—to assure them that the benefits would be there. It increased the security—and therefore the value—of GE's total compensation to them. Just as vested benefits are more valuable than those that are not vested, so this increase in the security of these non-vested benefits had an economic value too. Furthermore, it can be presumed that GE increased the value of benefits in this way to be "competitive" with its "peers," or other companies competing in the labor market. It can be presumed—because that is what GE itself has said throughout this case, namely, that it takes actions in the area of retiree benefits in order to be "competitive." As a matter of economic logic, if it did not add value this way, then to be "competitive" GE would substitute something else—whether it is pay or vacation or something else—to make up for a less attractive employment package.

That is, plaintiffs are just quoting back to GE its own claim that its total employment package is calculated to make GE "competitive." Based on GE's own argument, it is fair to presume injury in that without Section 5.4, GE would have done or said something else to secure the benefits. That might be higher wages, or it might be something entirely different—but it is fair to presume that GE would have substituted some other thing of value if it had been honest

11

and made clear that there were no promises and the benefits could go at any time. GE injured plaintiffs because it deprived them of the honest explanation of the terms and conditions of their employment—and from settling on a price for their services in an open and transparent manner.

Finally, there is a danger in this case of making too much of a distinction between the injury from the deception and the loss of the benefits. This is not a case where the plan administrator is different from the settler. Nor is it a case like *Kenseth* where a low-level employee has made a statement without express authority from the plan. In these typical situations, there is a concern about the fairness of imposing a liability that the actual defendant did not intend. This is not a case, for example, about poor Mr. Zarelli going rogue. GE itself made a promise to plaintiffs—that it would not cancel the benefits except under certain conditions. There should be no legal difference between GE making a contractual promise in an SPD and GE making a promise in any other kind of document. An enforceable promise is an enforceable promise. There should be no need to look for an injury separate and distinct from the breach of the promise. As pointed out above, there is a distinct injury here because GE made the promise as part of the SPD, and ERISA Section 1132 limits plaintiffs *only* to enforce promises that are part of the Plans. Furthermore, ERISA Section 1144 preempts plaintiffs from using any non-ERISA basis in state law or contract law to enforce the promise. So the use of the SPD to make the promise and then to deny enforcement is a distinct injury to the plaintiffs. Accordingly, as the Supreme Court makes clear, Section 1132(a)(3) of ERISA exists as a catch-all remedy to allow reformation of the plans to prevent this kind of unfairness. In that sense, the injury here is to use the SPD to make a binding contractual promise that plaintiffs without a reformation are not able to enforce.

For these reasons, the deception in this case—the violation of Sections 1022 and 1024, in and of itself—has created a legal handicap or injury which justifies the reformation of the Plans.

## IV.    Friedman's expert report does establish harm and is not offered as support for a calculation of damages.

GE rails against the expert report offered by Dr. Friedman, arguing that it does not offer support for the claim that the class members suffered billions in losses. GE's arguments miss the point, as Plaintiffs are not relying on Friedman's report for support for a calculation of damages. Plaintiffs do not seek repayment of their lost benefits in the form of damages in this case—they seek the equitable remedies of reformation and surcharge. For this reason, Friedman did not purport to offer a precise calculation of the premiums and co-pays that each of the named Plaintiffs (or any individual member of the class) will pay in the future as a result of GE cancelling their benefits. Friedman and the Plaintiffs agree with Dr. Baker and GE that it is impossible to know exactly how much each person will spend on healthcare or health insurance in the future, and therefore impossible to know exactly how much that amount will differ from what they would have spent under the GE Plans. But that is precisely the point. The purpose of Friedman's report is to show how valuable it is to be insulated against this uncertainty—to explain, in economic terms, the value of having defined benefit health insurance.

Friedman's report refutes the notion put forward by GE, David Speier, and Baker that an individual is not harmed by the loss of insurance until the day that his or her health care costs exceed what they would have been under GE's former coverage. Friedman notes that individuals are actually willing to pay a "premium" for insurance—that is, they pay more for protection than they will likely ever see in the form of benefits. As Friedman puts it:

> Because of the utility gain from certainty, people are willing to "overpay" for insurance. Because security is valuable, they will buy coverage at an actuarial value significantly less than 1. The

> amount that they are willing to overpay is an expression of the gain
> they get from coverage.

*Id.* at 10, ¶ 19.g. Thus, in economic terms, Evelyn Kauffman will not just be harmed if on some day in the future she gets very sick and her zero-premium policy fails to provide her the coverage that she would have received under the GE Medicare Plans. She is harmed because GE has robbed her of the security that her insurance provided against that possibility.

It is true, as GE points out, that Friedman did not look at the individual choices that class members made on OneExchange or the impact that had on last year's healthcare costs. That is true for two reasons. First, during discovery, GE stated that it did not possess information related to the costs class members incurred in selecting plans on OneExchange. *See* GE Resp. to Pls. 2nd Interrogatories, at PSOF Ex. X, at 4-5. In other words, Baker's analysis is based on data not provided to Plaintiffs until Dr. Baker issued his report—after the close of fact discovery and after Friedman issued his report—despite the fact that Plaintiffs requested it and GE apparently intended to rely upon it.

Second, Friedman's point does not depend on these individual choices. It depends on the notion that insurance has value because it provides protection to risk-averse individuals. This is a notion, notably, that Baker accepts. He does not quarrel with Friedman's statement that insurance provides this benefit—he argues only that individuals have varying levels of risk aversion, which impacts the value that insurance provides to different individuals. *See* Baker Report, Dkt. 77-1, at 62, ¶ 150. In fact, as Plaintiffs noted in their response brief, Baker also acknowledges that it would have been harmful for GE to take away coverage entirely—which is exactly what it did to Kauffman. GE may argue that Kauffman is better off now because she enrolled in a zero-premium plan and has remained healthy, but its own expert seems to disagree. Perhaps that is why GE only relied on Baker's report in opposition to class certification, not in their motion for

14

summary judgment. Baker does not conclude that GE's actions caused no harm, only that we cannot yet know the extent of that harm.

This is not to say that Friedman's numbers—which merely provide an estimated range of harm—are inaccurate or hard to believe. GE has bragged to shareholders that it saved well over a billion dollars by shifting the risk of future healthcare costs onto retirees. Friedman only estimates that the reciprocal effect of this benefit to GE was a comparable harm to retirees.

Finally, Friedman's report contains another opinion that should also not really be controversial: that GE received a benefit from having made the promise in Section 5.4. As set forth above, it cannot really be disputed that employees gave something up in exchange for GE's promise to make its best efforts to provide them retiree health insurance. But Friedman confirms this, noting that this is common sense among labor economists. Dkt. 90-1 at 7, ¶ 18.a. and n.16.

## V.     Plaintiffs are entitled to surcharge.

There is little to add to what plaintiffs have previously argued on behalf of a surcharge. Plaintiffs do not have to pick between reformation and surcharge, as GE argues. Surcharge is a remedy for the Plan as reformed, and plaintiffs conceive of reformation—as courts usually conceive it—as an interim step to another remedy, such as reinstatement of the plan or surcharge. Because of the administrative complexities of reinstatement, plaintiffs have chosen not to seek reinstatement, even though that would be an appropriate remedy. A surcharge that raises the Retiree Reimbursement Account to a level equal to what GE was paying on a participant basis when the Plans were in effect is appropriate. Such a surcharge is not "indefinite" but of a duration of six years to the closing of the donut hole—a period of time of reasonable duration.

## CONCLUSION

For all of these reasons, Plaintiffs respectfully request that the Court grant their motion for summary judgment.

15